# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, 1625 L Street NW Washington, DC 20036, | ) ) ) ) ) |
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, 80 F Street NW Washington, DC 20001, | ) Case No. 1:25-cv-03306 ) ) **) COMPLAINT FOR DECLARATORY** **) AND INJUNCTIVE RELIEF** ) |
| VOICE OF AMERICA EMPLOYEES UNION, LOCAL 1418, DISTRICT COUNCIL 20, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO 330 Independence Ave SW Cohen Building, Room 4193-A Washington, DC 20237, | ) ) ) ) ) ) ) ) |
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 1812 330 Independence Ave SW Cohen Building, Room 1169 Washington, DC 20237, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DONALD J. TRUMP, in his official capacity as President of the U.S., 1600 Pennsylvania Ave NW Washington, DC 20500, | ) ) ) ) ) |
| U.S. AGENCY FOR GLOBAL MEDIA, 330 Independence Ave SW, Cohen Building Washington, DC 20237, | ) ) ) ) |
| and | ) ) |
| KARI LAKE, in her official capacity as Acting CEO of the U.S. Agency for Global Media | ) ) ) ) |

330 Independence Ave, SW, Cohen Building )
Washington, DC 20237, )
                                          )
                          Defendants. )
_____ )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.        Congress has long recognized that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). Accordingly, in the Civil Service Reform Act of 1978, it created an extensive labor-management relations framework for federal civil servants, codified in Chapter 71 of Title 5 of the U.S. Code ("Chapter 71"). Chapter 71 provides that federal workers have the right to form and join unions and engage in collective bargaining with their federal agency employers through their chosen representatives. Congress gave the President the limited authority to issue an order excluding an agency or one of its subdivisions from Chapter 71's coverage, but only if the President determines that (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1). For decades, in accordance with Chapter 71, federal civilian employees at agencies across the government have served their country honorably while joining together with their fellow civil servants to collectively bargain.

2.        Plaintiffs American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") and American Federation of Government Employees, AFL-CIO ("AFGE"), by and through their affiliated local unions, Plaintiffs AFSCME Local 1418 and AFGE Local 1812, have long served as the chosen collective bargaining representatives of employees at the United States Agency for Global Media ("USAGM") and its Voice of America ("VOA"), which promote

freedom and democracy around the world. As such, Plaintiffs have negotiated collective bargaining agreements with USAGM that provided important benefits and protections to workers at USAGM.

3.     Soon after taking office, the present administration commenced efforts to dismantle and close USAGM, including VOA. The administration, through its politically appointed representatives at USAGM, including Defendant Kari Lake, ceased USAGM broadcasts, placed employees on administrative leave, cancelled grants and personal service contracts, and announced large-scale layoffs.

4.     Plaintiffs have persistently opposed the administration's efforts to dismantle and close USAGM and VOA. That opposition has taken the form of speech and petitioning activity protected by the First Amendment.

5.     Together with non-profit press freedom organizations, individual journalists, and other unions, Plaintiffs AFSCME and AFGE filed a lawsuit in federal court and obtained a preliminary injunction ordering Defendants to, among other things, restore VOA programming so that USAGM fulfills its statutory mandate that VOA "serve as a consistently reliable and authoritative source of news." 22 U.S.C. § 6202(c). Since the court entered that order, Plaintiffs AFSCME and AFGE have persisted in the district court to ensure compliance by Defendants.

6.     On August 25, 2025, as a result of AFSCME and AFGE's litigation seeking compliance with the preliminary injunction, the court ordered several high-ranking members of USAGM leadership, including Defendant Kari Lake, to sit for depositions to answer questions about the agency's compliance. The court described those depositions as "one final opportunity, short of a contempt trial," to explain what actions they were taking to comply with the preliminary injunction. Order at 2, *Widakuswara v. Lake*, No. 25-cv-887 (D.D.C. Aug. 25, 2025), Dkt. No. 72.

7.     Parallel to that litigation, Plaintiffs exercised their rights under their collective bargaining agreements ("CBAs") with USAGM, invoking the grievance process to prevent the administration from conducting a sweeping reduction-in-force ("RIF") in a manner that violated their rights under the CBAs. Those efforts by Plaintiffs forestalled the plans by Defendants to terminate the vast majority of USAGM's workforce, but in the evening of August 25, 2025, hours after the Court ordered the deposition of Defendant Lake, Defendants notified Plaintiffs of a renewed effort to conduct their planned RIF at the agency in a manner that would violate the CBAs. Plaintiffs quickly took steps to challenge this renewed effort.

8.     Defendants have become increasingly frustrated with the speech and petitioning activity by Plaintiffs in opposition to the efforts by Defendants to illegally dismantle USAGM and VOA. The administration has publicly expressed its growing animosity toward Plaintiffs and their opposition activities.

9.     On August 28, 2025—just three days after the court ordered depositions of Defendant Lake and other agency leaders and the agency notified Plaintiffs it was restarting the RIF process at USAGM—President Trump issued Executive Order 14343, entitled *Further Exclusions from the Federal Labor-Management Relations Program*, 90 Fed. Reg. 42683 (Aug. 28, 2025) ("Further Exclusion Order"). In the Further Exclusion Order, the President declared that pursuant to his authority under 5 U.S.C. § 7103(b), USAGM was no longer covered by Chapter 71.

10.     The next day, on August 29, 2025, USAGM notified Plaintiffs that it was rescinding its CBAs with Plaintiffs, which had provided workers at USAGM with important benefits, including procedural protections in the event of a RIF. The file name of the document sent by

4

USAGM to Plaintiff AFSCME Local 1418 cancelling its collective bargaining agreement was, tellingly, "AFSCME_2025RIF_AgencyNotice_20250829_signed."

11.    The timing and effect of Defendants' actions—together with their public statements and conduct—establish that those actions were substantially motivated by speech and petitioning activity by Plaintiffs that is protected by the First Amendment, including pursuing litigation and filing grievances to oppose the closure and dismantlement of USAGM and VOA.

12.    The statutory firewall that insulates USAGM network journalists from political control—and ensures that USAGM network journalists have editorial independence and do not serve as a policy arm of the United States government or any political administration—further demonstrates that the Further Exclusion Order was not issued because USAGM performs national security work but rather to retaliate against Plaintiffs for protected speech and petitioning activity.

13.    What is more, the Further Exclusion Order is part of a pattern of retaliation by this administration against labor organizations that speak out and litigate against its policies, in particular Plaintiffs AFSCME and AFGE. Most notably, on March 27, 2025, the President issued an executive order that excluded the vast majority of federal employees from Chapter 71. The March 27 Exclusion Order was accompanied by an official Fact Sheet explaining that the President had decided to exclude "hostile Federal unions" who were "fighting back" against his "agenda," specifically referencing AFGE's litigation, lobbying, and public relations efforts on behalf of civil service employees (much of which has been undertaken jointly with AFSCME).[1] Further driving home the point, the March 27 Fact Sheet concluded by drawing a line between how the President would treat unions willing to "work with him" and those who were not.

---

[1] https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.

14.    The Further Exclusion Order made that implicit threat real, by seeking to further hobble the federal sector unions that continue to exercise their rights to speak out against the President's policies and to disenfranchise federal employees who rely on the representation of disfavored federal sector unions to enforce their rights at work.

15.    The Further Exclusion Order and its implementation unconstitutionally retaliate against Plaintiffs for their protected First Amendment activity. The Further Exclusion Order is also *ultra vires*. Finally, the Further Exclusion Order and its implementation by Defendants have unlawfully stripped away contractual rights and protections from thousands of civil servants without the due process required by the Fifth Amendment.

16.    Because Defendants' actions violate Plaintiffs' and their members' constitutional rights and are *ultra vires*, and because Plaintiffs and their members face irreparable harm due to their loss of labor protections and constitutional rights, especially in light of the administration's plan to conduct a sweeping RIF that would functionally shutter the agency contrary to Plaintiffs' CBAs and statutory rights, the Further Exclusion Order should be enjoined.

## Jurisdiction

17.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

18.    Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201.

## Venue

19.    The District of Columbia is a proper venue for this action under 28 U.S.C. § 1391(e) because Plaintiffs are headquartered in the District, Plaintiffs represent federal employees in the District, and Defendants President Trump, Kari Lake, and U.S. Agency for Global Media reside in the District. Venue is also proper in the District of Columbia because a substantial part of the events giving rise to the claims asserted herein occurred in the District.

## **Parties**

20.     Plaintiff American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association headquartered at 1625 L Street, NW, Washington, DC 20036. AFSCME is the largest trade union of public employees in the United States with around 1.4 million members organized into approximately 3,400 local unions and 58 councils and affiliates in 46 states, the District of Columbia, and Puerto Rico. AFSCME, through its subordinate bodies, including AFSCME District Council 20 and constituent local unions such as AFSCME Local 1418, represents federal civilian employees in agencies and departments across the federal government, including at USAGM.

21.     Plaintiff Voice of America Employees Union, Local 1418, District Council 20, AFSCME, AFL-CIO ("AFSCME Local 1418") is a local union that represents a collective bargaining unit of USAGM employees who work on VOA programming. AFSCME Local 1418 is party to a CBA with USAGM that covers "all non-supervisory Radio Broadcast Technicians ('RBTs') employed by USAGM in the Radio Master Control" and "Radio Studios" in Washington, DC, as well as those "assigned to the New York News Bureau" in New York City, New York. These employees produce and engineer live broadcasts of radio programming, and they are essential to maintaining uninterrupted broadcasting operations.

22.     AFSCME, AFSCME Local 1418, and their members are dedicated to making our communities stronger, healthier, and safer, including by supporting the distribution of free press in repressive regimes worldwide through Voice of America.

23.     Plaintiff American Federation of Government Employees, AFL-CIO ("AFGE") is a labor organization and unincorporated association headquartered at 80 F Street NW, Washington,

DC 20001. AFGE, the largest union of federal workers, represents approximately 800,000 federal civilian employees through its affiliated councils and locals in every state in the United States. Through its affiliate Plaintiff AFGE Local 1812, AFGE represents employees at USAGM.

24.     Plaintiff AFGE Local 1812 represents roughly 600 employees at USAGM, including employees of Voice of America and the Office of Cuba Broadcasting. AFGE Local 1812 is a party to a CBA with USAGM that covers all "non-professional and professional" General Schedule and Wage System employees of USAGM except radio broadcast technicians and Foreign Service employees. These employees include journalists, broadcast production specialists, and administrative support staff.

25.     AFGE and AFGE Local 1812 are dedicated to fighting for dignity, safety, and fairness on the job for their members and promoting efficiency and the improvement of government service so that government can more effectively serve the American people.

26.     AFSCME, AFSCME Local 1418, AFGE, and AFGE Local 1812 ("Plaintiffs") bring this action on behalf of themselves as organizations and on behalf of their members, who have lost statutory and contractual protections at work due to the Further Exclusion Order.

27.     Defendant Donald J. Trump is the President of the United States. He is sued solely in his official capacity. In that capacity, he issued the Further Exclusion Order.

28.     Defendant United States Agency for Global Media (USAGM) is an independent agency that supports federally funded broadcast networks, including Voice of America (VOA), the Office of Cuba Broadcasting (OCB), Radio Free Asia (RFA), Radio Free Europe/Radio Liberty (RFE/RL), and the Middle East Broadcasting Network (MBN). Before Defendants' actions to dismantle the agency, USAGM networks broadcasted in 63 languages and reached a cumulative

weekly audience of 427 million people in more than 100 countries. USAGM is headquartered in the District of Columbia.

29.    Defendant Kari Lake began serving in the role of White-House appointed "Special Adviser" to USAGM on March 3, 2025. Ms. Lake claims to have been appointed Deputy CEO by the White House sometime in July and then shortly thereafter to have become Acting CEO of USAGM. Defendant Lake is sued in her official capacity.

**Factual Background**

## I.    Statutory Background

30.    Nearly five decades ago, Congress enacted the Civil Service Reform Act of 1978, which statutorily established collective bargaining for federal employees in Title VII, codified at Chapter 71 of Title 5 of the U.S. Code ("Chapter 71").[2] Previously, federal workers were permitted to engage in collective bargaining by virtue of a "series of Executive Orders." *AFGE v. FLRA*, 778 F.2d 850, 852 n.1 (D.C. Cir. 1985). Chapter 71 represented a congressional determination that the collective bargaining rights of federal employees should no longer be determined by executive orders issued by prerogative of the President. Instead, Chapter 71 set forth "[a] statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. 29186 (Sept. 13, 1978) (statement of Rep. Clay). "In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the [previous] regime." *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 107 (1983).

---

[2] Chapter 71 of Title 5 is also known as the Federal Service Labor-Management Relations Statute ("FSLMRS").

31.    In enacting Chapter 71, Congress found that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a).

32.    Chapter 71 "significantly strengthened the position of public employee unions while carefully preserving the ability of federal managers to maintain 'an effective and efficient Government.'" *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 92 (1983) (quoting 5 U.S.C. § 7101(b)).

33.    Chapter 71 guarantees employees "the right to form, join, or assist any labor organization, or to refrain from any such activity." 5 U.S.C. § 7102. Chapter 71 also guarantees employees the right to "engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter." *Id.* § 7102(2).

34.    Chapter 71 requires agencies to "accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election." *Id.* § 7111(a). Once labor organizations are certified as exclusive representatives, they must act for "all employees in the unit" and are required to represent the interests of all such employees "without discrimination and without regard to labor organization membership." *Id.* § 7114(a)(1).

35.    Federal employees voluntarily choose to join labor organizations and to pay membership dues to those organizations. *Id.* § 7115. If an employee within a bargaining unit so chooses and provides a written authorization to do so, agencies are required to deduct membership dues from an employee's pay and transmit those dues to the labor organization. *Id.* No employee is mandated to pay any membership dues, or any other fees, to a labor organization under the statutory framework.

36.    Chapter 71 requires agencies and exclusive representatives to negotiate in good faith to reach a collective bargaining agreement. Once an agreement is reached and executed, upon approval of the agency head, or failure to approve or disapprove the agreement within 30 days, the agreement "shall take effect and shall be binding on the agency and the exclusive representative." *Id.* § 7114(c)(3).

37.    As part of Congress's efforts to design a system "to meet the special requirements and needs of the Government," *id.* § 7101(b), Chapter 71 protects certain enumerated management rights, excluding those topics from the collective bargaining process, *id.* § 7106. *See NTEU v. Chertoff*, 452 F.3d 839, 861 (D.C. Cir. 2006) (noting that these limits "give[] federal agencies great 'flexibility' in collective bargaining"). For example, these management rights protect agency officials' authority "to determine the mission, budget, organization, number of employees, and internal security practices of the agency," and, "in accordance with applicable laws . . . to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees." 5 U.S.C. § 7106.

38.    Chapter 71 also protects agencies' right to "take whatever actions may be necessary to carry out the agency mission during emergencies." *Id.* § 7106(a)(2)(D). Accordingly, federal agencies are not required to bargain before taking actions in an emergency—national-security-related or otherwise.

39.    Chapter 71's bargaining framework is further tailored to ensure government flexibility by removing certain employees from its coverage. For example, Chapter 71 excludes "management official[s]"—individuals in positions "the duties and responsibilities of which require or authorize the individual to formulate, determine, or influence the policies of the agency"—from its definition of "employee." *Id.* § 7103 (a)(2)(iii), (a)(11). Furthermore,

11

bargaining units may not include "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security." *Id.* § 7112(b)(6).

40.    Likewise, Chapter 71 expressly excludes certain agencies from its scope, including the Government Accountability Office, the Federal Bureau of Investigation, the Central Intelligence Agency, the National Security Agency, the Tennessee Valley Authority, the Federal Labor Relations Authority, the Federal Service Impasses Panel, and the United States Secret Service. *Id.* § 7103(a)(3).

41.    Finally, in certain limited circumstances, the President is permitted to issue orders excluding other agencies or subdivisions thereof from Chapter 71. This is only permissible after a determination is made that (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" *and* (2) "the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b)(1).

## II.    The Trump Administration's Efforts to Dismantle USAGM

42.    VOA is a governmental media outlet that is guaranteed editorial independence by statute. Just as its name implies, VOA is a journalistic "voice" tasked with "communicating directly with the peoples of the world" to disseminate "a balanced and comprehensive projection of significant American thought and institutions." 22 U.S.C. § 6202(c). USAGM is an independent agency whose remit is to ensure the ongoing viability of VOA and other federally funded broadcast networks and to protect the independence of its journalists.

43.    Section 6204(b) of Title 22 of the United States Code provides that the Chief Executive Officer of USAGM "shall respect the professional independence and integrity of" VOA and the other USAGM networks. This firewall signifies that even though the networks are state funded, they are free, independent journalistic outlets designed to function like the most credible

12

and reputable private news organizations in the world. Describing the firewall on its website, USAGM states that "[t]he editorial independence of the journalists and broadcasters at USAGM's networks is a bedrock principle of their operation as public service media organizations . . . enshrined in both law and longstanding practice . . . and establishes, for that purpose, a protective firewall to insulate their broadcasters, their content, and staff from political and other such influence." USAGM further states that this firewall "notably differentiates the agency from state-sponsored propaganda operations."[3]

44.    Voice of America has long fulfilled its mission with unionized employees. VOA employees have collectively bargained with the agency for decades. AFSCME Local 1418 has represented its bargaining unit of radio broadcast technicians since 1996. Before then, since 1965, those radio broadcast technicians had been represented by National Federation of Federal Employees (NFFE) Local 1418. Likewise, AFGE has represented employees at USAGM and its predecessor agencies since 1958.

45.    On March 14, 2025, President Donald Trump issued Executive Order 14238, entitled *Continuing the Reduction of the Federal Bureaucracy*, 90 Fed. Reg. 13043 (Mar. 14, 2025). Executive Order 14238 demands that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law," and directs the head of USAGM to "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which components or functions of the governmental entity, if any, are statutorily required and to what extent." *Id*.

---

[3] https://www.usagm.gov/who-we-are/firewall/.

46.    The following day, on March 15, 2025, the White House published an article entitled "The Voice of Radical America," which states: "President Donald J. Trump's [Executive Order] on Friday will ensure that taxpayers are no longer on the hook for radical propaganda."[4]

47.    Immediately following the issuance of Executive Order 14238, the acting leadership of USAGM took a series of actions purportedly in furtherance of the Executive Order's directives.

48.    On March 15, 2025, USAGM turned off all VOA and OCB programming and placed 1,042 employees on administrative leave.

49.    That same day, all USAGM grantee networks received an identical letter from the agency immediately terminating their operative grant agreements, with no explanation other than the boilerplate language that "[t]he award no longer effectuates agency priorities" and citing the Executive Order.

50.    On March 16, 2025, USAGM terminated contracts with all personal services contractors, whose pay was scheduled to end on March 31, 2025.

51.    On March 17, 2025, USAGM instructed all USAGM Foreign Service employees to shut down all transmitters at their respective stations, place locally employed staff on leave, and expect to be placed on administrative leave themselves within two days.

52.    The decimation of USAGM and its employees and resources is an escalation of attempts to assert control over USAGM during the first Trump administration. In an effort to remake USAGM into the administration's public relations outlet, the first Trump administration breached the statutory firewall, attempted to cow journalists into submission, and sought to chill expressive conduct that it deemed out of lockstep with the administration. VOA journalists

---

[4] https://www.whitehouse.gov/articles/2025/03/the-voice-of-radical-america/.

employed by USAGM filed a lawsuit, and a court in this district preliminarily enjoined USAGM officials from taking certain actions in derogation of USAGM journalists' rights. *See generally Turner v. USAGM*, 502 F. Supp. 3d 333 (D.D.C. 2020).

### III. Plaintiffs File a Lawsuit Challenging the Dismantlement of USAGM, Frustrating the Administration's Efforts to Shut Down the Agency

53.     On March 21, AFSCME and AFGE joined non-profit press freedom organizations, individual journalists, and other unions to file a lawsuit in the Southern District of New York challenging the Trump Administration's dismantlement of USAGM and its VOA media programming. Complaint, *Widakuswara v. Lake*, No. 25-cv-2390 (S.D.N.Y. Mar. 21, 2025), Dkt. No. 1. The plaintiffs in that lawsuit filed for a temporary restraining order on March 24, 2025, and an expedited briefing schedule was set during a status conference on that same day.

54.     The next day, on March 25, 2025, USAGM's HR Director notified union officials at AFSCME Local 1418 that USAGM intended to "send termination notices" to twenty-nine of USAGM's thirty-two radio broadcast technicians. Because the three remaining radio broadcast technicians had already submitted retirement applications, this move would have effectively eliminated all radio broadcast technicians and wiped out Local 1418 entirely.

55.     Also on March 25, USAGM's HR Director sent a notice to AFGE Local 1812 conveying USAGM's decision to terminate 594 AFGE-represented employees—the vast majority of Local 1812's unit, including broadcast journalists, technicians, budget analysts, electronics engineers, and others—within weeks.

56.     On March 28, 2025, the court in the Southern District of New York issued a temporary restraining order that enjoined the acting leadership at USAGM from "taking any further actions to implement or effectuate the March 14, 2025 Executive Order," including "proceeding with any further attempt to terminate, reduce-in-force, place on leave, or furlough any

USAGM employee, or contractor." *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 62 (S.D.N.Y. 2025). On April 4, 2025, the court in the Southern District of New York transferred the case to the United States District Court for the District of Columbia. Order, *Widakuswara*, No. 25-cv-2390 (S.D.N.Y. Apr. 4, 2025), Dkt. No. 61.

57.     On April 22, the District Court for the District of Columbia entered a three-part preliminary injunction, ordering Defendants to (1) "return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order," (2) "restore FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks," and (3) "restore VOA programming such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news,' 22 U.S.C. § 6202(c)."

58.     The defendants in that case immediately appealed provisions (1) and (2) of the injunction and simultaneously moved for a stay in the district court and in the D.C. Circuit. The district court denied the stay application, but a divided panel of the D.C. Circuit granted the stay. The en banc D.C. Circuit denied review of the stay, and the merits of that appeal remain pending.

59.     The defendants did not appeal provision (3) of the injunction, requiring them to restore VOA. Although that provision remains in full force, the defendants have nonetheless not taken meaningful action to restore VOA programming.

60.     On May 31, the plaintiffs in the *Widakuswara* case filed a motion for an order to show cause why the defendants were not violating provision (3) of the preliminary injunction. The parties engaged in extensive briefing and a hearing that ultimately led the district court to grant the plaintiffs' motion on July 30, concluding that "judicial intervention is needed to ensure the defendants' compliance with the preliminary injunction." Order to Show Cause at 9, *Widakuswara v. Lake*, 25-cv-1015, (D.D.C. July 30, 2025), Dkt. No. 130. As part of the show cause order, the

court required the defendants to answer specific questions regarding their actions to restore VOA by August 13.

61.    The defendants did not meaningfully comply with the court's show cause order, either. After further briefing and another hearing, the court issued an order on August 25, 2025, finding that the agency's leadership, despite multiple opportunities to do so, had failed to "explain how they are in compliance with the Court's preliminary injunction, even on their preferred interpretation of VOA's statutory mandate." Order at 2, *Widakuswara*, No. 25-cv-1015, (D.D.C. Aug. 25, 2025), Dkt. No. 137.

62.    Based on that finding, the court ordered—over the strenuous objection of the defendants in that case—that plaintiffs be permitted to depose Kari Lake, Frank Wuco, and Leili Soltani, and that those depositions should occur before September 15, 2025. *Id.*

63.    The court characterized the depositions as representing "one final opportunity, short of a contempt trial," for the defendants to provide the required information. *Id.*

64.    Defendant Lake has repeatedly expressed her public disapproval of the legal efforts to stop the dismantlement of USAGM.

65.    For example, on April 4, 2025, Lake stated in an interview, "I don't like what I'm seeing with what's happening in the court . . . temporary restraining orders, the threat of holding me in contempt of court, that kind of thing."

66.    On April 7, 2025, Lake stated in an interview, "we've been dragged into court, and they're trying to prevent us from listening to the president. And so we're in a court battle now, and they're trying to push contempt charges at me[.]"

67.    On April 23, 2025, Lake stated in an interview that the lawsuit brought by AFGE, AFSCME, and others led to "a restraining order and made us stop doing what we're doing" and

"unfortunately, we were never able to do the type of the reform that we wanted" because a judge "is meddling in a place that he shouldn't."

68.    On June 25, amid the show cause proceedings, Lake characterized the lawsuit by Plaintiffs as "malicious" in testimony before the House Foreign Affairs Committee. On August 12, 2025, Lake stated in an interview, "Of course, I've got a judge who wishes he were running the agency and literally threatening to put me in contempt of court if I don't produce more propaganda, lock me up if I don't produce more propaganda."

69.    In her August 12 interview, Lake also stated, "Every time I'm facing an issue with my agency where I'm like, okay, how do we kind of get through that? I'm telling you, it's almost like I start to think, how can we work through an issue of something that's difficult, and then, boom, within like, a week, an executive order comes out addressing that issue."

70.    On August 14, 2025, Lake posted on X (formerly Twitter) a clip of her August 12 interview, stating, "I've got a judge who wishes he were running the agency and literally threatening to put me in contempt of court if I don't produce more propaganda . . . . It's frustrating, but I've got some experience in lawfare."[5]

## IV.    In Parallel, Plaintiffs Have Invoked Contractual Grievance Rights to Protect the Employment Rights of Their Members

71.    Plaintiffs have entered into collective bargaining agreements with USAGM that provide workers at USAGM with important protections. Those protections include safety and health requirements to ensure worker welfare, procedural requirements when the agency proposes a RIF, protections for workers facing disciplinary and adverse actions, and provisions covering working hours, overtime, sick leave, and time off.

---

[5] https://x.com/KariLakeWarRoom/status/1956144581189210151.

72.     The collective bargaining agreements between Plaintiffs and USAGM provide that when USAGM seeks to conduct a reduction in force, it must provide notices to the unions and affected employees and must provide certain assistance to employees displaced by the reduction in force. Notably, both CBAs require the agency "shall provide a specific written notice to each employee affected by a reduction in force or transfer of function at least 60 calendar days prior to the effective date."

73.     On March 25, 2025, USAGM notified Plaintiffs through their local affiliates that USAGM intended to carry out a RIF. On March 31, USAGM informed Plaintiffs that the agency would not proceed with the RIF at that time as a result of the temporary restraining entered by the court in the Southern District of New York on March 28.

74.     In mid-June 2025, after the provision of the district court's injunction barring RIFs had been stayed by the D.C. Circuit, USAGM began taking steps to resume the reduction in force.

75.     On June 16, 2025, USAGM sent Plaintiffs retention registers listing employees potentially subject to the RIF, and, on June 20, 2025, USAGM began sending RIF notices to individual employees.

76.     That same day, AFGE Local 1812 sought a meeting with USAGM pursuant to Article 21 of its CBA to discuss how the agency's implementation of the RIF violated the law and CBA. Pursuant to the CBA grievance procedure, the parties met on June 23 to attempt to resolve the matter before a formal written grievance was filed, with AFGE raising numerous contractual and legal violations.

77.     AFSCME Local 1418 also sought to inform USAGM of legal deficiencies in the agency's implementation of the RIF. For example, on June 24, 2025, AFSCME Local 1418's president wrote to the agency identifying errors in the retention register. In response, on June 25,

2025, USAGM human resources personnel requested more detailed information regarding the agency's errors, including specific names of employees affected by the errors. AFSCME Local 1418 provided that information the same day.

78.    The unions' actions were effective. On June 27, 2025, the agency notified employees in the D.C. competitive area that the legally deficient RIF notices they had received were rescinded. The rescission notice stated that "the agency will be running another RIF in the near future."

79.    USAGM did not rescind RIF notices to employees represented by AFGE in New York and Florida, and, after AFGE Local 1812 tried to persuade the agency to rescind those notices as well, Local 1812 filed a formal grievance demanding that the agency rescind the notices issued to employees outside the D.C. competitive area and offer those employees the same retirement incentives it had offered its employees in D.C. Within days, the agency complied with those demands, and Local 1812 withdrew the grievance.

80.    In the meantime, the agency and the unions began negotiating ground rules for negotiations over the next RIF. Ground rules are the first step in the collective bargaining process, and, as their name suggests, they set the process the parties will use for their negotiations. Both AFSCME Local 1418 and AFGE Local 1812 signed a memorandum of agreement (MOA) with USAGM setting the ground rules for negotiations on July 11, 2025.

81.    The unions and the agency engaged in bargaining over the RIFs throughout July and August, but those negotiations did not conclude, with numerous issues still open and subject to negotiation. At no point did either party declare impasse in the negotiations.

82.     Defendant Lake stated in an August 13, 2025 declaration that USAGM has been "regularly and in good faith engaged" with unions including AFSCME and AFGE "regarding the

possibility of one or more future RIFs of USAGM employees who are currently on administrative leave." Decl. of Kari Lake ¶ 18, *Widakuswara*, No. 25-cv-1015 (D.D.C. Aug. 13, 2025), Dkt. No. 134-2.

83.    On August 19, 2025, AFSCME Local 1418 filed a grievance. In the June retention registers that the agency had provided to the union, the agency had indicated its plan to separate all Master Control members of the bargaining unit. That would violate the provisions of the CBA requiring the agency to assign bargaining unit members to work in Radio Master Control, at least absent an emergency. The August 19 grievance demanded that the agency comply with these provisions of the CBA. To this date, the agency has not responded to the grievance.

84.    On August 25, 2025, "USAGM notified relevant unions with copies of annotated retention registers to be used to issue specific notices to affected bargaining unit employees regarding reduction in force and transfer of function." Notice at 2, *Widakuswara*, No. 25-cv-1015 (D.D.C. Aug. 13, 2025), Dkt. No. 138. Those retention registers still violated the CBA provision that was at issue in the August 19 grievance filed by AFSCME Local 1418 because the registers indicated that all Master Control members of the AFSCME bargaining unit would be separated from the agency.

85.    Upon receipt of the August retention registers, AFGE Local 1812 immediately requested an informal meeting to raise several issues with the retention registers, including the agency's decision to implement the RIF without completing bargaining as required by the CBA. That meeting, which was the first step to filing a new grievance, took place on August 27. At that meeting, the union indicated to the agency that it would file a grievance.

### V.    In Retaliation for Plaintiffs' Protected Activity, The President Issues the Further Exclusion Order and USAGM Terminates CBAs

86.    On August 28, 2025, President Trump issued Executive Order 14343, entitled *Further Exclusions from the Federal Labor-Management Relations Program* ("Further Exclusion Order").[6] In it, he declared that pursuant to his authority under 5 U.S.C. § 7103(b)(1), the "United States Agency for Global Media" was no longer subject to Chapter 71.

87.    OPM issued previous guidance explaining that presidential exclusion orders pursuant to § 7103(b) caused unions to lose their status as exclusive representatives. Off. of Pers. Mgmt., Guidance on Executive Order *Exclusions from Federal Labor-Management Programs*, (Mar. 27, 2025) ("OPM Guidance").[7] As such, the Further Exclusion Order purported to immediately strip Plaintiffs of their legal right to serve as exclusive representatives of bargaining units of employees at USAGM.

88.    The White House published a Fact Sheet the same day as the Further Exclusion Order.[8] The August 28 Fact Sheet claimed that "USAGM is an arm of U.S. public diplomacy; supporting U.S. national security is one of its key functions."

89.    The August 28 Fact Sheet contended that "procedural requirements in Federal labor-management relations can create delays in agency operations," claiming that CBAs "limit[] agencies' ability to modify policies promptly" and "can delay the implementation of time-sensitive national security measures."

---

[6] https://www.whitehouse.gov/presidential-actions/2025/08/further-exclusions-from-the-federal-labor-management-relations-program/.

[7] https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf.

[8] https://www.whitehouse.gov/fact-sheets/2025/08/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements-6a95/.

90.    The day after issuing the Further Exclusion Order, on August 29, 2025, the agency

sent notices to Plaintiffs informing them that, pursuant to the Further Exclusion Order, "collective

bargaining rights under Chapter 71 are no longer applicable to your bargaining unit" and that "[a]ll

collective bargaining activities, including negotiations, grievance procedures, and all labor-

management relations, are hereby discontinued."

91.    The letter also stated that "effective immediately, the Agency is hereby cancelling

the collective bargaining agreement[s] between the Agency" and Plaintiffs.

92.    Defendants did not give prior notice to Plaintiffs or affected employees of a

determination that USAGM was an agency whose "primary purpose" was national security, that

the agency would be excluded from collective bargaining, or that Plaintiffs' CBAs would be

cancelled. Nor did Defendants give Plaintiffs or affected employees notice of the unclassified

evidence supporting the underlying determination that purportedly formed the basis of either the

exclusion or the termination of the CBA, and therefore neither Plaintiffs nor affected employees

had an opportunity to rebut such evidence.

93.    The Further Exclusion Order was issued shortly after significant developments in

the lawsuit filed by Plaintiffs challenging the dismantlement of USAGM. AFSCME and AFGE

had informed the district court in that case that Defendants had failed to comply with the court's

preliminary injunction and were in the middle of proceedings to ensure compliance. On August

25, 2025 the district court had, as a "final opportunity, short of a contempt trial," to allow

Defendants to show they were in compliance, ordered a deposition of Defendant Lake and others

to be completed by September 15, 2015.

94.    USAGM's exclusion from Chapter 71 in the Further Exclusion Order was not only

intended to retaliate against Plaintiffs for their litigation efforts, but also had the purpose and effect

of impeding Plaintiffs' use of the grievance procedure, collective bargaining process, and CBAs to enforce procedural rights related to RIFs at the agency.

95.    Highlighting that the purpose and effect of the Further Exclusion Order was to make it easier to fire workers en masse, the Office of Personnel Management has previously instructed agencies that the exclusion of an agency or subdivision pursuant to § 7103(b) obligates the agency to "[d]isregard [c]ontractual RIF [a]rticles," such that "[a]fter terminating their CBAs," they "should conduct RIFs . . . without regard to provisions in terminated CBAs that go beyond" statutory and regulatory requirements. OPM Guidance at 5.

96.    But for the Further Exclusion Order and subsequent notice from the agency, Plaintiffs' collective bargaining agreements would still be in effect.

97.    On August 29, before the parties had completed bargaining and within hours of cancelling the CBAs, USAGM sent RIF specific notices to over 500 of its remaining employees. For most employees, the notices were effective 30 days from their issuance, in violation of the provisions of the CBAs between Plaintiffs and USAGM that require notice of 60 days.

98.    In summary, on August 28 and 29, 2025, Defendants purported not only to revoke the *statutory* collective bargaining rights of Plaintiffs' members, but then also to rescind the lawfully bargained *contractual* rights that had previously been successfully invoked to stop Defendants' efforts to shutter USAGM. Plaintiffs' members are therefore facing termination on an accelerated timeframe and without the representation of their unions or the protections of their contracts.

99.    Further demonstrating that the elimination of bargaining rights for USAGM employees was tied to Plaintiffs' protected activity regarding RIFs at USAGM, the August 29 letter sent to AFSCME Local 1418 informing the union that USAGM was terminating its collective

bargaining          agreement          had          the          file          name          of

"AFSCME_2025RIF_AgencyNotice_20250829_signed.pdf."

100.    The statutory firewall between USAGM's politically appointed leaders and its journalist broadcasters also demonstrates that the purported grounds for excluding USAGM from Chapter 71 are pretextual. The firewall protects USAGM broadcasters from political influence and ensures that they act as independent journalists, not policy makers—in the area of national security or elsewhere. The statutory firewall therefore belies the claim that it is necessary to exclude USAGM from Chapter 71 because the agency performs national security work as a primary function, confirming that Defendants instead excluded USAGM from Chapter 71 to retaliate against Plaintiffs for exercising their First Amendment rights.

## VI.    The Retaliatory Revocation of Statutory and Contractual Rights Has Harmed Plaintiffs and Their Members

101.    Plaintiffs AFSCME and AFGE, by and through their affiliated AFSCME Local 1418 and AFGE Local 1812, represented bargaining unit employees at USAGM as the certified exclusive representative pursuant to 5 U.S.C. § 7111, until the Further Exclusion Order. Regardless, they remain the representatives of their members, all of whom join the union voluntarily, including employees of USAGM.

102.    Plaintiffs' leadership are democratically elected by and from their respective members.

103.     Plaintiffs' activities are funded by their members through voluntary membership dues.

104.    In addition to representing federal bargaining unit employees as exclusive representatives pursuant to Chapter 71, Plaintiffs represent their members through a variety of

mechanisms, including political advocacy, the submission of public comments to agency rulemakings, and litigation in court.

105.    Due to the Further Exclusion Order, Plaintiffs' members are now facing an impending expedited RIF without the representation of their union or the substantive or procedural rights guaranteed by their collective bargaining agreement. As such, Plaintiffs' members are unable to enforce their bargained-for rights governing RIFs or their statutory rights to bargain, and Plaintiffs are unable to bring institutional grievances challenging the agency's efforts.

106.    Furthermore, Plaintiffs' representation of federal civilian employees includes engaging in collective bargaining with federal agencies including USAGM and providing representation in binding arbitrations and other matters—including formal discussions and investigative examinations—arising under Chapter 71. By removing USAGM from the coverage of Chapter 71, the Further Exclusion Order eliminates statutory protections and rights for Plaintiffs as labor organizations representing employees at USAGM.

107.    The Further Exclusion Order bars Plaintiffs from performing core services for their members working at USAGM: representing them in negotiations with agencies to secure binding collective bargaining agreements covering federal employees' working conditions, negotiating over changes to terms and conditions of employment including RIFs, and enforcing those obligations through contractual grievance procedures and/or unfair labor practice proceedings before the Federal Labor Relations Authority.

108.    Defendants have informed Plaintiffs that they must vacate office space by September 30, 2025 that had been provided pursuant to their CBAs.

109.    In addition to contractual rights involving the ongoing RIF at USAGM, Plaintiffs' members have also lost other contractual rights and protections governing their working conditions

that they had obtained through collective bargaining. For example, members have lost rights covering safety and health requirements to ensure their welfare, procedures for and limits on discipline and adverse actions against members, and provisions covering working hours, overtime, sick leave, and time off. *See* AFGE CBA Arts. 27, 20, 23, 24; AFSCME CBA Arts. 5, 12, 6.

110.    Next, because the government has excluded Plaintiffs' members at USAGM from coverage under Chapter 71, those members' statutory protections guaranteeing voluntary payroll deduction of dues, *see* 5 U.S.C. § 7115, are no longer in effect. The associated loss of payroll-deduction rights will cause Plaintiffs to lose revenue that is used to further their mission.

111.    AFSCME Local 1418 and AFGE Local 1812 face an existential threat from the Further Exclusion Order and its implementation because the Order eliminates the core pathway that these local unions use to represent their members: collective bargaining and enforcing their rights and CBAs through the grievance procedure. The Order also eliminates the main way these local unions receive dues from their members and, combined with impending RIFs, would decimate union membership and the accompanying revenue from membership dues.

112.    Finally, Plaintiffs are harmed because the time in which members are deprived of union representation—together with the abject lesson that union representation can be unilaterally withdrawn on a whim should management decide the union is too outspoken on behalf of its members—will decrease the union's support. That will inevitably decrease its ability to bargain effectively even if bargaining rights are eventually restored—either by a court or a future administration. *See Fed. Educ. Ass'n v. Trump*, No. 25-cv-1362, 2025 WL 2355747, at *18 (D.D.C. Aug. 14, 2025); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011).

VII.   **The Further Exclusion Order is Part of a Pattern of Retaliation by This Administration Against Labor Organizations That Speak Out and Litigate Against the President and His Policies**

113.    From the beginning of his second term, President Trump has repeatedly used the powers of the Presidency to retaliate against private individuals and organizations for engaging in disfavored First Amendment activity. *See, e.g.*, *Perkins Coie LLP v. DOJ*, No. 25-cv-716, 2025 WL 1276857, at *2 (D.D.C. May 2, 2025) ("[T]his Order stigmatizes and penalizes a particular law firm and its employees . . . due to the Firm's representation . . . of clients pursuing claims and taking positions with which the current President disagrees."); *Jenner & Block LLP v. DOJ*, No. 25-cv-916, 2025 WL 1482021, at *12 (D.D.C. May 23, 2025) (President Trump sought to "'leverage' the Executive's control over security clearances as a way to change speech."); *Wilmer Cutler Pickering Hale & Dorr LLP v. EOP*, No. 25-cv-917, 2025 WL 1502329, at *14 (D.D.C. May 27, 2025) ("The Order shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished!"); *Susman Godfrey LLP v. EOP*, No. 25-cv-1107, 2025 WL 1779830, at *17 (D.D.C. June 27, 2025) ("[T]he Order constitutes unlawful retaliation . . . for activities that are protected by the First Amendment, including its representation of certain clients [and] its donations to certain causes."); *President & Fellows of Harvard Coll. v. DHS*, No. 25-cv-11472, 2025 WL 1737493, at *16–17, 22 (D. Mass. June 23, 2025) (granting preliminary injunction against "the government's misplaced efforts to control a reputable academic institution and squelch diverse viewpoints seemingly because they are, in some instances, opposed to this Administration's own views"); *Mohammed H. v. Trump*, No. 25-cv-1576, 2025 WL 1692739, at *3–4 (D. Minn. June 17, 2025) (granting habeas claim noting the "more plausible inference" that "Petitioner was arrested and detained because he expressed pro-Palestinian views and criticized violence in Gaza").

114.    President Trump himself has announced his intention to use his administration to target groups based on their speech, stating "We have a lot of law firms that we're going to be going after . . . [b]ecause they were very dishonest people." Joe DePaolo, *'We Have a Lot of Law Firms We're Going After': Trump Declares Plan to Target Law Firms He Considers 'Very, Very Dishonest'*, Mediaite (Mar. 9, 2025), https://www.mediaite.com/news/we-have-a-lot-of-law-firms-were-going-after-trump-declares-plan-to-target-law-firms-he-considers-very-very-dishonest/. During a March 24, 2025 cabinet meeting, President Trump reiterated his intention to retaliate against law firms, stating "law firms have to behave themselves," and "they behave very badly, very wrongly." Michael Birnbaum, *Law firms refuse to represent Trump opponents in the wake of his attacks*, Washington Post (Mar. 25, 2025), https://www.washingtonpost.com/politics/2025/03/25/trump-law-firms/.

115.    Since the beginning of 2025, AFSCME, AFGE, their affiliates, and some of their fellow labor organizations have been on the front lines in the press, social media, airwaves, and in the courts opposing the Trump administration's agenda. *See, e.g.*, *AFGE v. Trump*, No. 25-cv-264 (D.D.C.) (AFGE, AFSCME); *AFGE v. Ezell*, No. 25-cv-10276 (D. Mass.) (AFGE, AFSCME); *AFGE v. OPM*, No. 25-cv-1780 (N.D. Cal.) (AFGE, AFSCME); *AFSCME v. SSA*, No. 25-cv-596 (D. Md.) (AFSCME); *AFL-CIO v. DOL*, No. 25-cv-339 (D.D.C.) (AFSCME, AFGE); *All. for Retired Ams. v. Bessent*, No. 25-cv-313 (D.D.C.) (AFGE); *Somerville Pub. Schs. v. Trump*, No. 25-cv-10677 (D. Mass.) (AFSCME).

116.    Plaintiffs, along with their allies, have achieved major success in court cases challenging the legality of various executive actions taken by the Trump administration. For example, on March 13, 2025, in a case brought by AFGE, AFSCME, local unions, and non-profit organizations, a federal judge granted a preliminary injunction from the bench that required

reinstatement of thousands of fired probationary workers at the Departments of Veterans Affairs, Agriculture, Interior, Energy, Defense, and Treasury. *AFGE v. OPM*, 770 F. Supp. 3d 1215 (N.D. Cal. 2025). Most recently, AFSCME and its affiliated local unions have secured preliminary injunctions from district courts requiring the cancellation of RIFs of AFSCME members employed, and the reinstatement of grants made, by the Corporation for National and Community Service (aka AmeriCorps), as well as the reinstatement of public health grants to local governments by the Department of Health and Human Services (HHS). *See Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-1458, 2025 WL 1865971 (D. Md. July 7, 2025) (AmeriCorps); *Harris Cnty. v. Kennedy*, No. 25-cv-1275, 2025 WL 1707665 (D.D.C. June 17, 2025) (HHS grants).

117.    The Trump administration has monitored which entities are filing suits against the administration. Elon Musk reposted on X an attack on a coalition of organizations supporting the civil service, which includes members who have filed suits challenging Trump administration policies, that characterized the group as conducting a "coordinated hit job" on President Trump's agenda and directly named Plaintiffs AFGE and AFSCME. @elonmusk, X (Feb. 12, 2025, 10:28 PM), https://x.com/elonmusk/status/1889879302965191056. Musk also reposted a story on X about a lawsuit successfully blocking cuts to National Institutes of Health funding stating "Which law firms are pushing these anti-democratic cases to impede the will of the people?" @elonmusk, X (Feb. 11, 2025, 1:24 PM), https://x.com/elonmusk/status/1889380095015465272.

118.    The focus on lawsuits against the administration is further demonstrated by a March 6, 2025 memorandum for agency heads from President Trump stating that "[i]n recent weeks, activist organizations . . . have obtained sweeping injunctions . . . functionally inserting themselves into the executive policy making process and therefore undermining the democratic process" and

demanding that agencies request that courts require securities to be posted by parties seeking preliminary relief.

119.    On March 27, 2025, President Trump issued an Executive Order entitled *Exclusions From Federal Labor-Management Relations Program*, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("First Exclusion Order"). In it, he declared that pursuant to his authority under 5 U.S.C. § 7103(b), a broad swath of agencies was excluded from Chapter 71. The effect of the First Exclusion Order was to strip collective bargaining rights from of the vast majority of the federal workforce.

120.    Although the First Exclusion Order purported to be tailored to agencies and subdivisions that have as their primary function "intelligence, counterintelligence, investigative, or national security work," the scope of the Executive Order belied that rationale. For example, the Executive Order carved out from the exclusion subdivisions of the Marshals Service and "any agency police officers, security guards, or firefighters," *except* those working at the Bureau of Prisons, where AFGE represents all bargaining unit employees. Similarly, employees at the Bureau of Engraving and Printing—which prints currency, among other documents—retained their bargaining rights while employees at the U.S. Mint—which mints coins and is exclusively represented by AFGE—lost their rights.

121.    The First Exclusion Order also instructed agency heads to report to the President additional agency subdivisions "that have as a primary function intelligence, counterintelligence, investigative, or national security work . . . [and] for which the agency head believes [Chapter 71] cannot be applied . . . in a manner consistent with national security requirements and considerations."

122.    That same night, the White House issued a Fact Sheet describing its Exclusion Order that laid bare the true reason for the President's Exclusion Order: retaliating against

Plaintiffs and other "hostile Federal unions" for daring to stand up and oppose "President Trump's agenda."[9]

123.    The March 27 Fact Sheet also stated that "[t]he largest Federal union"—Plaintiff AFGE— "describes itself as 'fighting back' against Trump. It is widely filing grievances to block Trump policies."

124.    In addition, it specifically indicated that the First Exclusion Order was issued in response to the filing of grievances regarding the administration's policies, highlighting that "VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day."

125.    The document concluded with an implicit threat: "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions."

126.    Although it excluded both the Department of Defense and Department of Veterans Affairs from Chapter 71 in their entirety, the First Exclusion Order delegated authority to the VA Secretary and Defense Secretary to restore bargaining rights to selected subdivisions.

127.    The VA Secretary exercised his authority to restore rights on a union-by-union basis. Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16427 (Apr. 17, 2025). In so doing, the VA explained that these unions were being reinstated because they had filed "no or few grievances," while other unions, including Plaintiff AFGE, "by contrast are using their authority" under Chapter 71 "to broadly frustrate the

---

[9] The White House, Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/.

administration's ability to manage the agency."[10] The VA later terminated the CBAs of the unions it did not reinstate. When doing so, it again explained its decision to target these unions because of their protected First Amendment speech.

128.    Plaintiffs AFSCME and AFGE, along with other unions affected by the First Exclusion Order, filed a lawsuit contending, among other things, that the First Exclusion Order unlawfully retaliated against them for their protected speech and activity. *AFGE v. Trump*, No. 25-cv-3070, 2025 WL 1755442, at *9 (N.D. Cal. June 24, 2025), *stayed pending appeal*, 2025 WL 2180674 (9th Cir., Aug. 1 2025), *en banc vote called*, No. 25-4014, Dkt. No. 40.1 (Aug. 25, 2025).

129.    The exclusion of USAGM from Chapter 71 is another retaliatory action against these labor organizations in response to their speech and petitioning activity, both in court and through labor-management channels, to resist the dismantlement of USAGM and VOA, the type of activity the President has described as "obstruction that jeopardizes his ability to manage agencies."

130.    Retaliating against activity protected by the First Amendment and seeking to more easily dismantle an agency are not proper bases to exclude an agency from Chapter 71 rights pursuant to § 7103(b).

## <u>Count I</u>

*Retaliation and Viewpoint Discrimination in Violation of the First Amendment*

131.    Plaintiffs reallege Paragraphs 1 through 130.

132.    AFSCME and AFGE have exercised their First Amendment right to petition the government by filing lawsuits against the Trump administration challenging a variety of anti-

---

[10] Erich Wagner, *VA Is Selectively Enforcing Trump's Order Stripping Workers of Union Rights*, Government Executive (Apr. 18, 2025), https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/.

worker actions and other aspects of "Trump's agenda." One of those lawsuits challenged the administration's decision to dismantle USAGM.

133.    Plaintiffs have also made public statements critical of policies advanced by the Trump administration.

134.    Plaintiffs AFSCME and AFGE and their affiliates, including Plaintiffs AFSCME Local 1418 and AFGE Local 1812, have also petitioned the government by filing grievances challenging Trump administration policies that have harmed their federal employee bargaining unit members. Amongst those grievances was a successful challenge to reductions in force at USAGM. Moreover, the agency and administration were aware that Plaintiffs were preparing to file additional grievances over the August implementation of the RIF.

135.    The Further Exclusion Order was initiated, and was issued, in retaliation for Plaintiffs' protected exercise of their First Amendment rights.

136.    In direct response and in close temporal proximity to recent developments in AFSCME and AFGE's litigation against USAGM, including a court-ordered deposition of Lake to determine if the agency has complied with injunctive relief secured by Plaintiffs, Defendants have retaliated against Plaintiffs by eliminating their status as exclusive representative at USAGM and excluding their members employed by USAGM from federal labor law protection.

137.    Defendants have rescinded binding CBAs between USAGM and Plaintiffs and have since violated the terms of those CBAs by effectuating expedited RIFs, ceasing collective bargaining with Plaintiffs over RIFs, and terminating outstanding grievances in furtherance of the retaliatory Further Exclusion Order.

138.    The elimination of the right to serve as exclusive representative, abrogation of contracts, and associated economic injury to Plaintiffs and their members serves to chill First Amendment protected conduct by a person of ordinary firmness.

139.    The Further Exclusion Order is in accord with President Trump's ongoing efforts to retaliate against those who exercise their First Amendment rights to oppose the administration and its favored policies, including Plaintiffs and their members.

140.    The chill resulting from the Further Exclusion Order will also heighten the chilling effect of the First Exclusion Order, by letting unions know that even if they currently retain the ability to represent federal employees at a particular agency, those rights can still be ripped away if a union exercises its First Amendment rights in opposition to the President's agenda.

141.    Plaintiffs represent employees in agencies where the threat remains that additional bargaining rights will be stripped away. The threat that unions will face the elimination of their representation rights and their membership, paired with the admonition in the First Exclusion Order's Fact Sheet that Trump supports "unions who work with him," chills unions and their members from voicing political views critical of the Trump administration and coerces public support of the Trump administration.

### Count II

*Ultra Vires*

142.    Plaintiffs reallege Paragraphs 1 through 141.

143.    Pursuant to 5 U.S.C. § 7103(b)(1), agencies or subdivisions thereof may only be excluded from Chapter 71 if (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work," and (2) "the provisions of [Chapter

71] cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations."

144.    Decades of consistent practice demonstrates that this exclusion is meant to be applied narrowly.

145.    The very Federal Labor Relations Authority case cited by the First Exclusion Order cautions that "national security" must be read narrowly in light of the fact that "[l]abor organizations and collective bargaining in the civil service have been determined by the congress to be 'in the public interest.'" *Dep't of Energy & NAGE, Loc. R5-181*, 4 F.L.R.A. 644, 656 (1980) (quoting 5 U.S.C. § 7101(a)); *see Cole v. Young*, 351 U.S. 536, 544–47 (1956).

146.    The removal of USAGM from Chapter 71 was not based on a determination that the agency had as a "primary function" national security and that Chapter 71 could not be applied "consistent with national security requirements and considerations." Instead, USAGM was included in the Further Exclusion Order to punish Plaintiffs for exercising their First Amendment rights and to make it easier to dismantle the agency entirely.

147.    The fact that for decades, civilians working at USAGM and VOA specifically have served their country while retaining collective bargaining protections under Chapter 71, belies the claim that these protections cannot be applied to USAGM "in a manner consistent with national security requirements and considerations."

148.    USAGM's structure and statutory firewall, which requires leadership to "respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency," 22 U.S.C. § 6204(b), further belies the claim that Chapter 71 rights cannot be applied consistent with national security requirements. The unilateral control sought by

Defendants is inconsistent with Congress's intent in setting up a structure in which political appointees do not control the content of USAGM programming.

149.    The exclusion authority contained in § 7103(b) is intended to permit certain agencies and subdivisions with a "primary function" of national security to accomplish these functions in the rare circumstances where the carefully crafted labor rights in Chapter 71 would render doing so impossible. It is not intended to aid the destruction of agencies, nor is there a national security interest in dismantling an agency created by Congress.

150.    The Further Exclusion Order is a continuation of this administration's efforts to use the exemption to destroy Congress's carefully crafted collective bargaining system and eliminate federal labor law protections for the vast majority of federal workers.

151.    Instead of considering whether labor practices could be applied consistent with national security requirements, President Trump used the pretext of national security to attack unions he concluded had "declared war on [his] agenda" and were not "work[ing] with him."

152.    Because the Further Exclusion Order is contrary to Chapter 71 of Title 5, including 5 U.S.C. § 7103(b)(1), it is *ultra vires* and void.

## Count III

*Violation of the Fifth Amendment (Procedural Due Process)*

153.    Plaintiff realleges Paragraphs 1 through 152.

154.    The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law." U.S. Const. amend. V.

155.    "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment." *Lynch v. United States*, 292 U.S. 571, 579 (1934).

156.    Chapter 71 makes clear that federal collective bargaining agreements are binding on all parties. *See* 5 U.S.C. §§ 7114, 7116.

157.    USAGM's termination of CBAs with Plaintiffs pursuant to the Further Exclusion Order has deprived Plaintiffs and their members of constitutionally protected property interests.

158.    The Supreme Court and the D.C. Circuit "have recognized that the right to know the factual basis for the action and the opportunity to rebut the evidence supporting that action are essential components of due process." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

159.    Even when national security concerns and decisions of the President are implicated, due process of law requires notice of the presidential determination and "the unclassified support therefor and the opportunity to rebut the unclassified supporting evidence." *Id.*

160.    Because the Further Exclusion Order and purported cancellation of Plaintiffs' CBAs with USAGM were issued without giving Plaintiffs the underlying unclassified evidence supporting the President's determination, and an opportunity to rebut that evidence, it should be enjoined.

## **Count IV**

*Violation of the Fifth Amendment (Abrogation of Property Rights in Federal Contract)*

161.    Plaintiff realleges Paragraphs 1 through 160.

162.    "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term

implies, as it would be if the repudiator had been a State or a municipality or a citizen." *Lynch*, 292 U.S. at 580 (quoting *The Sinking Fund Cases*, 99 U.S. 700, 719 (1878)).

163.    As the Fact Sheet announcing the Further Exclusion Order admitted, "[c]ollective bargaining agreements (CBAs) remain in effect until their expiration."

164.    Because Congress authorized USAGM, like other federal agencies, to form binding contracts that created protected property interests, "the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power." *Lynch,* 292 U.S. at 579.

165.    Because the Further Exclusion Order and USAGM's implementation thereof abrogates Plaintiffs' contracts with the federal government and associated property interests, it violates the Fifth Amendment and should be enjoined.

## **Relief Requested**

**WHEREFORE**, Plaintiffs pray that this Honorable Court enter an ORDER:

A.  Declaring that the Further Exclusion Order and USAGM's implementation thereof, including its termination of Plaintiffs' CBAs, violates the First Amendment, violates the Fifth Amendment, and is *ultra vires*;

B.  Enjoining the Defendants and their agents and successors from implementing or otherwise giving effect to Sections 1 and 2 of the Further Exclusion Order, including but not limited to by requiring that Defendants and their agents restore Plaintiffs' CBAs and their status as certified exclusive representatives of USAGM employees;

C.  Granting Plaintiffs' attorney's fees and costs; and

D.  Granting such other relief as this Court may deem just and proper.

Respectfully submitted,

Date: September 19, 2025

/s/ *Abigail V. Carter*
Abigail V. Carter (DC Bar ID: 474454)
John M. Pellettieri*
Lane Shadgett (DC Bar ID: 90009847)
J. Alexander Rowell (DC Bar ID: 1780007)
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street, N.W. Suite 1000
Washington, D.C. 20005
Tel: (202) 842-2600
Fax: (202) 842-1888
acarter@bredhoff.com
jpellettieri@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com

*Counsel for Plaintiffs*
*\*Pro hac vice application forthcoming*

Teague P. Paterson (DC Bar ID: 144528)
Matthew S. Blumin (DC Bar ID: 1007008)
Georgina Yeomans (DC Bar ID: 1510777)
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL EMPLOYEES,
AFL-CIO
1625 L Street NW
Washington, DC 20036
Tel: (202) 775-5900
Fax: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
gyeomans@afscme.org

*Counsel for Plaintiffs American Federation of State,*
*County and Municipal Employees, AFL-CIO*
*(AFSCME) and AFSCME Local Union 1418*

Rushab B. Sanghvi (DC Bar ID: 1012814)
AMERICAN FEDERATION OF GOVERNMENT
EMPLOYEES, AFL-CIO
80 F Street NW
Washington, DC 20001
Tel: (202) 639-6426

SanghR@afge.org

*Counsel for Plaintiffs American Federation
of Government Employees (AFGE) and AFGE
Local Union 1812*