**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, *et al.*,            Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*,            Defendants. | Case No. 1:25-cv-03306 <br><br> **HEARING REQUESTED BY OCTOBER 20** |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**THEIR MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND .............................................................................................. 2

    A.   For Decades, USAGM and Its Predecessors Successfully Disseminated Objective Journalism Throughout the World with Unionized Employees ........................................ 2

    B.   Plaintiffs Exercise Their Constitutional Rights to Oppose Efforts to Dismantle USAGM 4

    C.   Days After Significant Litigation Wins by Plaintiffs, Defendants Eliminate Labor Rights at USAGM ............................................................................................................... 10

    D.   The Further Exclusion Order Continues a Pattern of Retaliation Against AFGE, AFSCME, and Others Who Oppose the Administration's Policies ................................. 13

LEGAL STANDARD ......................................................................................................... 18

ARGUMENT ...................................................................................................................... 18

    I.   Plaintiffs are Likely to Succeed on the Merits .................................................... 18

        A.   The Further Exclusion Order Violates the First Amendment ......................... 19

        B.   Defendants' Elimination of Labor Rights for Plaintiffs and Represented Employees at USAGM is *Ultra Vires* ............................................................ 29

        C.   Plaintiffs' Claims Are Not Channeled to the FLRA ..................................... 37

    II.   Plaintiff Unions and Their Members Are Suffering Irreparable Injury Due to the Exclusion Order and its Implementation ............................................................. 38

    III.   The Balance of the Equities and Public Interest Favors Preliminary Injunctive Relief ... 41

CONCLUSION ................................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aditya W.H. v. Trump,*
  782 F. Supp. 3d 691 (D. Minn. 2025) .................................................................25

*\*AFGE Loc. 446 v. Nicholson,*
  475 F.3d 341 (D.C. Cir. 2007) ...........................................................................38

*AFGE v. Ezell,*
  No. 25-cv-10276 (D. Mass.) ...............................................................................15

*AFGE v. Noem,*
  No. 25-cv-00451, 2025 WL 1557270 (W.D. Wash. June 2, 2025) ..................16, 25

*AFGE v. OPM,*
  770 F. Supp. 3d 1215 (N.D. Cal. 2025), *stayed pending appeal*, 145 S. Ct.
  1914 (Apr. 8, 2025) .............................................................................................15

*AFGE v. OPM,*
  No. 25-cv-01780, 2025 WL 2633791 (N.D. Cal. Sept. 12, 2025) .........................16

*AFGE v. Reagan,*
  870 F.2d 723 (D.C. Cir. 1989) ...........................................................................36

*AFGE v. Trump,*
  No. 25-cv-00264 (D.D.C.) ...................................................................................15

*AFGE v. Trump,*
  No. 25-cv-03070, 2025 WL 1755442 (N.D. Cal. June 24, 2025), *stayed
  pending appeal on other grounds*, 148 F.4th 648 (9th Cir. 2025) ..............21, 23, 37

*In re AFGE,*
  790 F.2d 116 (D.C. Cir. 1986) ...........................................................................39

*AFL-CIO v. DOL,*
  No. 25-cv-00339 (D.D.C.) ...................................................................................15

*AFSCME v. SSA,*
  No. 25-cv-00596 (D. Md.) ...................................................................................15

*All. for Retired Ams. v. Bessent,*
  No. 25-cv-00313 (D.D.C.) ...................................................................................15

*Am. Bar Ass'n v. DOJ,*
  783 F. Supp. 3d 236 (D.D.C. 2025) .....................................................................25

*Am. Foreign Serv. Ass'n v. Trump*,
  No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ..................................31

*\*Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016) ..............................................................19, 20

*Ariz. Students Ass'n v. Ariz. Bd. of Regents*,
  824 F.3d 858 (9th Cir. 2016) ............................................................................21

*ATF v. FLRA*,
  464 U.S. 89 (1983) ............................................................................................4

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) ..........................................................................................29

*BE & K Constr. Co. v. NLRB*,
  536 U.S. 516 (2002) ........................................................................................20

*BEG Invs., LLC v. Alberti*,
  144 F. Supp. 3d 16 (D.D.C. 2015) ..................................................................24

*Berrigan v. Sigler*,
  499 F.2d 514 (D.C. Cir. 1974) ........................................................................31

*Borough of Duryea v. Guarnieri*,
  564 U.S. 379 (2011) ........................................................................................20

*Cefalo v. Moffett*,
  No. 786-71, 1971 WL 797 (D.D.C. June 28, 1971) ........................................39

*Chamber of Com. of U.S. v. Reich*,
  74 F.3d 1322 (D.C. Cir. 1996) ........................................................................30

*\*Cole v. Young*,
  351 U.S. 536 (1956) ............................................................................31, 32, 34

*Dalton v. Specter*,
  511 U.S. 462 (1994) ........................................................................................30

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988) ........................................................................30

*Dep't of Energy, Oak Ridge Operations & NAGE, Loc. R5-181*,
  4 F.L.R.A. 644 (1980) ................................................................................31, 34

*Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*,
  No. 25-cv-01458, 2025 WL 1865971 (D. Md. July 7, 2025) ..........................16

*Elrod v. Burns,*
   427 U.S. 347 (1976)................................................................................................28

*Ercelik v. Hyde,*
   No. 25-cv-11007, 2025 WL 1361543 (D. Mass. May 8, 2025)................................................25

*\*FEA v. Trump,*
   No. 25-cv-01362, 2025 WL 2355747 (D.D.C. Aug. 14, 2025)...........30, 35, 36, 37, 38, 39, 41

*Garcia v. District of Columbia,*
   56 F. Supp. 2d 1 (D.D.C. 1998)...............................................................................20

*Garrison v. Louisiana,*
   379 U.S. 64 (1964)................................................................................................20

*Glob. Health Council v. Trump,*
   No. 25-5097, 2025 WL 2480618 (D.C. Cir. Aug. 28, 2025)................................................30

*Grundmann v. Trump,*
   770 F. Supp. 3d 166 (D.D.C. 2025)...........................................................................38

*Harris Cnty. v. Kennedy,*
   No. 25-cv-01275, 2025 WL 1707665 (D.D.C. June 17, 2025)............................................16

*Hartley v. Wilfert,*
   918 F. Supp. 2d 45 (D.D.C. 2013)............................................................................21

*Hoffman v. Parksite Grp.,*
   596 F. Supp. 2d 416 (D. Conn. 2009)........................................................................41

*Home Bldg. & Loan Ass'n v. Blaisdell,*
   290 U.S. 398 (1934)................................................................................................28

*Janus v. AFSCME Council 31,*
   585 U.S. 878 (2018)................................................................................................20

*Jenner & Block LLP v. DOJ,*
   No. 25-cv-00916, 2025 WL 1482021 (D.D.C. May 23, 2025)................................17, 21, 25

*League of Women Voters of the U.S. v. Newby,*
   838 F.3d 1 (D.C. Cir. 2016)..............................................................................18, 41

*Legal Servs. Corp. v. Velazquez,*
   531 U.S. 533 (2001)................................................................................................29

*Lozman v. City of Riviera Beach,*
   585 U.S. 87 (2018)..........................................................................................19, 20

iv

*Mahdawi v. Trump*,
781 F. Supp. 3d 214 (D. Vt. 2025) .........................................................................25

*Media Matters of Am. v. FTC*,
No. 25-cv-01959, 2025 WL 2378009 (D.D.C. Aug. 15, 2025) ..............................24

*\*Media Matters for Am. v. Bailey*,
No. 24-cv-00147, 2024 WL 3924573, at \*15 (D.D.C. Aug. 23, 2024), *appeal
dismissed sub nom.*, *Media Matters for Am. v. Paxton*, No. 24-7141, 2025 WL
492257 (D.C. Cir. Feb. 13, 2025) ......................................................................22, 24

*Mohammed H. v. Trump*,
No. 25-cv-01576, 2025 WL 1692739 (D. Minn. June 17, 2025) ...........................25

*Mountain States Legal Found. v. Bush*,
306 F.3d 1132 (D.C. Cir. 2002) ...............................................................................30

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977) ..................................................................................................19

*Nat'l Ass'n of Immigr. Judges v. Owen*,
139 F.4th 293 (4th Cir. 2025) ...................................................................................38

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) ......................................................................................22, 28, 29

*New York Times Co. v. United States*,
403 U.S. 713 (1971) ..................................................................................................28

*NTEU v. Trump*,
780 F. Supp. 3d 237 (D.D.C. 2025), *stayed pending appeal*, 2025 WL
1441563 (D.C. Cir. May 16, 2025) ..........................................13, 23, 33, 35, 37

*Ohio Adjutant Gen.'s Dep't v. FLRA*,
598 U.S. 449, 452 (2023) ............................................................................................4

*OPM v. FLRA*,
864 F.2d 165 (D.C. Cir. 1988) ..................................................................................33

*Öztürk v. Trump*,
779 F. Supp. 3d 462 (D. Vt. 2025) ...........................................................................25

*Perkins Coie LLP v. DOJ*,
783 F. Supp. 3d 105 (D.D.C. 2025) .....................................................................17, 25

*President & Fellows of Harvard Coll. v. DHS*,
No. 25-cv-11472, 2025 WL 1737493 (D. Mass. June 23, 2025) .............................25

*President & Fellows of Harvard Coll. v. HHS*,
    No. 25-cv-11048, 2025 WL 2528380 (D. Mass. Sept. 3, 2025) .......................17, 26

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ..................................................................................40

*Ramirez v. ICE*,
    568 F. Supp. 3d 10 (D.D.C. 2021) .......................................................................18, 41

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
    515 U.S. 819 (1995) ...................................................................................................29

*\*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) ..............................................................................39, 40

*Somerville Pub. Schs. v. Trump*,
    No. 25-cv-10677 (D. Mass.) .......................................................................................15

*Sport Air Traffic Controllers Org. & U.S. Dep't of the Air Force*,
    68 F.L.R.A. 9 (2014) ..................................................................................................27

*Susman Godfrey LLP v. EOP*,
    No. 25-cv-01107, 2025 WL 1779830 (D.D.C. June 27, 2025) ...........................17, 25

*Turner v. USAGM*,
    502 F. Supp. 3d 333 (D.D.C. 2020) .............................................................................2

*U.S. Att'ys Off. S. Dist. of Tex. & AFGE Loc. 3966*,
    57 F.L.R.A. 750 (2002) ..............................................................................................37

*U.S. Dep't of Defense v. AFGE*,
    No. 25-cv-00119, 2025 WL 2058374 (W.D. Tex. July 23, 2025) ...............................37

*United States v. Robel*,
    389 U.S. 258 (1967) ...................................................................................................28

*W Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ...................................................................................................19

*Widakuswara v. Lake*,
    773 F. Supp. 3d 46 (S.D.N.Y. 2025) ............................................................................6

*\*Widakuswara v. Lake*,
    779 F. Supp. 3d 10 (D.D.C. 2025), *stayed in part pending appeal*, 2025 WL
    1288817 (D.C. Cir. May 3, 2025) .............................................................................5, 7

Order to Show Cause, *Widakuswara v. Lake*,
    No. 25-cv-01015 (D.D.C. July 30, 2025), Dkt. No. 130 ...............................................7

Order, *Widakuswara v. Lake*,
  No. 25-cv-01015 (D.D.C., Aug. 25, 2025), Dkt. No. 137 .................................................8, 24

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ....................................................7

*Widakuswara v. Lake*,
  No. 25-5144, 2025 WL 1556440 (D.C. Cir. May 22, 2025) ..................................................7

Order, *Widakuswara v. Lake*,
  No. 25-5144 (D.C. Cir. May 28, 2025), Doc. 2117869 ..........................................................7

Order, *Widakuswara v. Lake*,
  No. 25-5144 (D.C. Cir. May 28, 2025), Doc. 2117911 ..........................................................7

*Wilmer Cutler Pickering Hale & Dorr v. EOP*,
  No. 25-cv-00917, 2025 WL 1502329 (D.D.C. May 27, 2025).......................................17, 25

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................................................41

**Statutes**

5 U.S.C. § 7101(a) ...............................................................................................4, 30, 32, 36, 41

5 U.S.C. § 7102 .............................................................................................................................4

5 U.S.C. § 7103(b) ..............................................11, 12, 13, 29, 30, 31, 32, 33, 34, 36, 37, 38

5 U.S.C. § 7104(b) ......................................................................................................................38

5 U.S.C. § 7106(a)(2)(D)........................................................................................................27, 32

5 U.S.C. § 7112(b)(6) ..................................................................................................................32

5 U.S.C. § 7115 ............................................................................................................................41

22 U.S.C. § 6203(a) ......................................................................................................................2

22 U.S.C. § 6204(b) .........................................................................................................3, 34, 36

**Other Authorities**

5 C.F.R. § 351.802(a)(6) ..............................................................................................................40

5 C.F.R. § 1201.3(c)(1) ................................................................................................................40

124 Cong. Rec. 29186 (Sept. 13, 1978) (statement of Rep. Clay)................................................32

Exec. Order 14238, *Continuing the Reduction of the Federal Bureaucracy*. 90 Fed. Reg. 13043 (Mar. 14, 2025) ................................................................. 4

Exec. Order 14244, *Addressing Remedial Action by Paul Weiss*, 90 Fed. Reg. 13685 (Mar. 21, 2025) ..................................................................................... 17

Exec. Order 14251, *Exclusions From Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14553 (Apr. 4, 2025) ......................................... 13, 14, 35

Exec. Order 14343, *Further Exclusions from the Federal Labor-Management Relations Program*, 90 Fed. Reg. 42683 (Aug. 28, 2025) ............................ 11, 12

Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg. 16427 (Apr. 17, 2025) ............................................... 14

S. Rep. No. 95-969 (1978) ........................................................................................ 38

Complaint, *Widakuswara v. Lake*, No. 25-cv-02390 (S.D.N.Y. Mar. 21, 2025), Dkt. No. 1 ................................. 5

Decl. of Crystal Thomas, *Widakuswara v. Lake*, No. 25-cv-01015 (D.D.C., Apr. 14, 2025), Dkt. No. 88-4 .......................... 9

Notice, *Widakuswara v. Lake*, No. 25-cv-01015 (D.D.C. Aug. 26, 2025), Dkt. No. 139 .......................... 11

Notice, *Widakuswara v. Lake*, No. 25-cv-01015 (D.D.C. Aug. 28, 2025), Dkt. No. 141 .......................... 11

## INTRODUCTION

Plaintiffs are unions who represent federal workers and have advocated on behalf of those workers and themselves against policies of the present administration that hurt workers and violate the law. Their activities have often taken the form of speech and petitioning, including lawsuits and public advocacy, and have frequently been successful, including in the courts. Plaintiffs have notably had success opposing the dismantlement of the United States Agency for Global Media ("USAGM") and its Voice of America ("VOA"), both in court and through the enforcement of collective bargaining agreements ("CBAs") with the agency. The President and his administration have taken note. They have labeled Plaintiffs AFSCME and AFGE as "hostile" to the administration, called Plaintiffs' successful legal efforts "malicious," and made clear that they seek to bring the unions to heel.

While Plaintiffs have spoken without fear of retribution, they have not avoided retribution. Using a statutory provision in which Congress gave the President limited authority to exclude an agency (or a subdivision thereof) from the statutory labor framework governing federal employees if the President determines that the agency (or subdivision) performs national security work as a primary function and that labor protections are incompatible with national security, the President and his administration have retaliated against Plaintiffs by excluding agencies where Plaintiffs represent workers, refusing to recognize Plaintiffs as the chosen representative of those workers, and terminating the collective bargaining agreements that Plaintiffs negotiated with federal agencies on behalf of federal workers.

Most recently, after a string of litigation victories by Plaintiffs that culminated in an order requiring Defendant Kari Lake, the acting head of USAGM, to sit for a deposition by Plaintiffs to determine whether she has complied with court orders, the President issued an order excluding

USAGM from the federal labor laws. USAGM quickly followed with an announcement that it was terminating its collective bargaining agreements with Plaintiffs.

The exclusion of USAGM and its employees from federal labor protections is unlawful. The principle that the government cannot punish individuals or organizations for disfavored speech or petitioning is one of our Constitution's bedrock protections. Nor may the President or other members of the Executive Branch exceed clear limitations on the statutory authority bestowed on them by Congress. Defendants unconstitutionally retaliated against Plaintiffs by excluding USAGM from the labor laws and terminating their collective bargaining agreements to punish Plaintiffs for protected speech and activity. And Defendants acted *ultra vires* and beyond their statutory authority by excluding USAGM from the labor laws to punish Plaintiffs rather than on the basis of the national-security determinations required by statute. This Court should issue a preliminary injunction to avoid the grave irreparable harm that Plaintiffs and their members will suffer absent preliminary relief.

## FACTUAL BACKGROUND

### A.  For Decades, USAGM and Its Predecessors Successfully Disseminated Objective Journalism Throughout the World with Unionized Employees

Going back to World War II, the United States government has funded broadcasting to bring impartial news and truthful information to millions of people across the globe. Congress established the United States Agency for Global Media ("USAGM") as an independent agency dedicated to international broadcasting. *See* 22 U.S.C. § 6203(a). USAGM operates Voice of America ("VOA"), a network that has broadcasted around the world since its first transmission in 1942, when it announced a simple credo: "The news may be good or bad; we shall tell you the truth." *Turner v. USAGM*, 502 F. Supp. 3d 333, 341 (D.D.C. 2020) (citation omitted).

Congress created a firewall between the politically appointed leadership of USAGM and its broadcast networks—including VOA—that requires USAGM leadership to "respect the professional independence and integrity of" those networks. 22 U.S.C. § 6204(b). As described by USAGM, "[t]he editorial independence of the journalists and broadcasters at USAGM's networks is a bedrock principle of their operation as public service media organizations," and the firewall "insulate[s] their broadcasters, their content, and staff from political and other such influence." U.S. Agency for Glob. Media, *Firewall*, https://www.usagm.gov/who-we-are/firewall/ (last visited Sept. 17, 2025). The firewall "differentiates the agency from state-sponsored propaganda operations." *Id.*

Unions have represented workers at VOA and USAGM (or its predecessor agency) for most of VOA's existence. Plaintiff American Federation of Government Employees, AFL-CIO ("AFGE") has represented employees at VOA and USAGM since 1958 and currently represents 600 employees at USAGM——including journalists, broadcast production specialists, and administrative support staff—through its affiliate Plaintiff AFGE Local 1812. Hickey Decl. ¶¶ 3–6. Plaintiff American Federation of State, County & Municipal Employees, AFL-CIO ("AFSCME") has represented radio broadcast technicians at VOA and USAGM since 1996 through its affiliate Plaintiff AFSCME Local 1418, which was previously affiliated with another union that had represented those workers since 1965. Dryden Decl. ¶¶ 5–7. On behalf of workers at USAGM, these unions have negotiated and entered into collective bargaining agreements with the agency that cover working conditions; they have negotiated over changes to terms and conditions of employment, including reductions in force; and they have pursued enforcement of the agency's contractual obligations. Dryden Decl. ¶¶ 8–9, 11, 35–39; Hickey Decl. ¶¶ 8–9, 21–36; Ricci Decl. ¶ 8; Kelley Decl. ¶ 4.

Since 1978, collective bargaining at USAGM and throughout the federal government has been governed by the provisions of the Civil Service Reform Act of 1978 codified in Chapter 71 of Title 5 of the U.S. Code ("Chapter 71"). Chapter 71 "establishe[d] a comprehensive framework governing labor-management relations in federal agencies," *Ohio Adjutant Gen.'s Dep't v. FLRA*, 598 U.S. 449, 452 (2023), guaranteeing employees the right to form and join labor organizations and engage in collective bargaining through their chosen representatives, *see* 5 U.S.C. § 7102. In enacting Chapter 71, Congress recognized that collective bargaining "safeguards the public interest, . . . contributes to the effective conduct of public business, and . . . facilitates and encourages the amicable settlements of disputes," and that therefore "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). Chapter 71 "significantly strengthened the position of public employee unions while carefully preserving the ability of federal managers to maintain 'an effective and efficient Government.'" *ATF v. FLRA*, 464 U.S. 89, 92 (1983) (quoting 5 U.S.C. § 7101(b)).

### B.  Plaintiffs Exercise Their Constitutional Rights to Oppose Efforts to Dismantle USAGM

On March 14, 2025, President Trump announced his intention to dismantle USAGM and put an end to VOA as we know it by issuing Executive Order 14238, *Continuing the Reduction of the Federal Bureaucracy*. 90 Fed. Reg. 13043 (Mar. 14, 2025). The Executive Order demanded that "the non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law," and directed the head of USAGM to "submit a report to the Director of the Office of Management and Budget confirming full compliance with this order and explaining which" of its "components or functions . . . if any, are statutorily required and to what extent." *Id.* The next day, the White House published an article, entitled "The Voice of Radical America," laying bare its plans regarding VOA. The article asserted that EO 14238

4

"will ensure that taxpayers are no longer on the hook for radical propaganda," claimed that VOA reporters "posted anti-Trump" comments, and highlighted VOA content to illustrate its purported "leftist bias." Dryden Decl. Ex. 3 at 1.

USAGM's acting leadership moved quickly to carry out the President's demands. They placed 1,042 employees on administrative leave, terminated grant agreements with networks, cancelled personal service contracts, and instructed employees to shut down transmitters. *Widakuswara v. Lake*, 779 F. Supp. 3d 10, 21–22 (D.D.C. 2025), *stayed in part pending appeal*, 2025 WL 1288817 (D.C. Cir. May 3, 2025). As a result, Voice of America fell silent for the first time since its founding during World War II. *Id.* at 22.

Plaintiffs AFSCME and AFGE mobilized quickly to oppose the dismantlement, joining together with a group of non-profit press freedom organizations, individual journalists, and other unions to file a lawsuit in the Southern District of New York on March 21. Complaint, *Widakuswara v. Lake*, No. 25-cv-02390 (S.D.N.Y. Mar. 21, 2025), Dkt. No. 1. The plaintiffs in that lawsuit moved for a temporary restraining order on March 24, 2025.

The very next day, USAGM's HR Director informed AFSCME and AFGE that there would be a sweeping reduction-in-force ("RIF") at USAGM, which, if consummated, would separate the overwhelming majority of USAGM employees from the agency. The HR Director notified AFSCME that USAGM intended to "send termination notices" to twenty-nine of its thirty-two radio broadcast technicians "in the next few weeks," a move that would eliminate the entire bargaining unit represented by AFSCME because the three remaining radio broadcast technicians had already submitted retirement applications. Dryden Decl. ¶ 19 & Ex. 4 at 1. The HR Director similarly notified AFGE that USAGM would terminate 594 AFGE bargaining unit employees, including broadcast journalists, technicians, budget analysts, electronics engineers, and others.

Hickey Decl. ¶ 15 & Ex. 2.

AFSCME and AFGE and the other plaintiffs in the case in the Southern District of New York successfully obtained a temporary restraining order on March 28. The temporary restraining order put the RIF on pause, prohibiting USAGM's acting leadership from "taking any further actions to implement or effectuate the March 14, 2025 Executive Order," including by "proceeding with any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee, or contractor." *Widakuswara v. Lake*, 773 F. Supp. 3d 46, 62 (S.D.N.Y. 2025).

Defendant Kari Lake, who then held the title of Special Advisor to USAGM, was furious about the temporary restraining order and spoke candidly about her frustration in multiple interviews. On April 4, 2025, she stated in an interview, "I don't like what I'm seeing with what's happening in the courts . . . . temporary restraining orders, the threat of holding me in contempt of court, that kind of thing." Kari Lake War Room, *Clip from Wayne Allyn Root Interview with Kari Lake*, at 01:20–01:30 (X, Apr. 4, 2025), https://x.com/KariLakeWarRoom/status/1908236841888997830. On April 7, she complained, "We've been dragged into court, and they're trying to prevent us from listening to the president. And so, we're in a court battle right now, and they're trying to push contempt charges at me[.]" Kari Lake (@KariLake), *Bolling! Interview with Kari Lake*, at 06:25–06:34 (X, Apr. 7, 2025), https://x.com/KariLake/status/1909381086620299413.

The *Widakuswara* case was transferred to the U.S. District Court for the District of Columbia, and on April 22, a court in this district issued a three-part preliminary injunction ordering the defendants to (1) "return USAGM employees and contractors to their status prior to the March 14, 2025 Executive Order," (2) "restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks," and (3) "restore VOA programming

such that USAGM fulfills its statutory mandate that VOA 'serve as a consistently reliable and authoritative source of news.'" *Widakuswara*, 779 F. Supp. 3d at 39–40 (quoting 22 U.S.C. § 6202(c)). Defendant Lake complained to an interviewer the next day that the lawsuit led to "a restraining order and made us stop doing what we're doing" and "unfortunately, we were never able to do the type of the reform that we wanted" because a judge "is meddling in a place that he shouldn't." Newsmax, *Kari Lake reacts to Klaus Schwab investigation: 'Not shocked at all'*, at 01:17–01:28 (YouTube, Apr. 23, 2025), https://www.youtube.com/watch?v=NkA6o0RKf5E.

Although parts of the preliminary injunction have been stayed pending appeal,[1] the government did not appeal provision (3), which required USAGM to restore VOA programming, and therefore that provision has remained in effect since April 22. Nevertheless, USAGM failed to take meaningful action to comply with that provision or even sufficiently explain to the court how it was seeking to comply. On May 31, AFGE and AFSCME and the other plaintiffs in *Widakuswara* moved for an order for the defendants to show cause as to why they were not violating provision (3) of the injunction.

After extensive briefing and a hearing, the district court granted the plaintiffs' motion on July 30, stating that "judicial intervention is needed to ensure the defendants' compliance with the preliminary injunction." Order to Show Cause at 9, *Widakuswara v. Lake*, No. 25-cv-01015 (D.D.C. July 30, 2025), Dkt. No. 130. The court's order required the defendants to answer specific

---

[1] A divided panel of the D.C. Circuit granted a stay of provisions (1) and (2) pending appeal. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025). The en banc D.C. Circuit denied review of the stay as to provision (1), and the merits of that appeal remain pending. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1556440 (D.C. Cir. May 22, 2025); *see also* Order, *Widakuswara*, No. 25-5144 (D.C. Cir. May 28, 2025), Doc. 2117869 (statements respecting denial of reconsideration en banc, Srinivasan, C.J. & Pillard, J.). Because the court granted rehearing en banc on network grant funding in a related case, rehearing the stay of provision (2) was not necessary because the *Widakuswara* plaintiff's irreparable harm from the stay of that provision was alleviated. *See* Order, *Widakuswara*, No. 25-5144 (D.C. Cir. May 28, 2025), Doc. 2117911.

questions by August 13 about their actions to restore VOA. Defendant Lake again made her displeasure clear, telling an interviewer that "I've got a judge who wishes he were running the agency and literally threatening to put me in contempt of court if I don't produce more propaganda, lock me up if I don't produce more propaganda." The Afternoon Addiction with Garret Lewis, *Garret Talks to Kari Lake About Russia Hoax Indictments & EVERYTHING!*, at 1:20:02–1:20:18 (iHeart, Aug. 12, 2025), https://www.iheart.com/podcast/82-the-afternoon-addiction-wit-28403 290/episode/garret-talks-to-kari-lake-about-289408654/.

AFSCME and AFGE continued to press for the defendants in the *Widakuswara* case to comply with the district court's preliminary injunction, and USAGM's failure to respond adequately to the show-cause order prompted another round of briefing and argument. On August 25, 2025, the district court issued an order finding that USAGM's leadership had failed to "explain how they are in compliance with the Court's preliminary injunction, even on their preferred interpretation of VOA's statutory mandate." Order at 2, *Widakuswara*, No. 25-cv-01015 (D.D.C., Aug. 25, 2025), Dkt. No. 137. As a result, "to allow the defendants one final opportunity, short of a contempt trial, to provide such explanation," the court ordered, over the defendants' strenuous objection, that the *Widakuswara* plaintiffs be permitted to depose Kari Lake and two other agency declarants by September 15. *Id.*

At the same time that AFSCME and AFGE were vigorously opposing the dismantlement of USAGM in court, their local unions also stood up for the rights of workers at USAGM and forestalled the dismantlement by enforcing the agency's commitments in their collective bargaining agreements. Each of those collective bargaining agreements contained provisions addressing agency reductions-in-force, including a requirement that USAGM "provide a specific written notice to each employee affected by a reduction in force or transfer of function *at least 60*

*calendar days prior to the effective date*." Dryden Decl. Ex. 1, Art. 15 § 5(e); Hickey Decl. Ex. 1, Art. 30 § 5(e) (emphasis added). As USAGM's HR Director acknowledged, before "removing any bargaining unit employees" in a reduction in force, the agency's collective bargaining agreements obligated USAGM to participate in "impact and implementation bargaining to the extent requested by the unions," "respond[] to union information requests," "provid[e] the unions with retention registers," and provide "specific notice to bargaining unit employees." Decl. of Crystal Thomas ¶¶ 10–11, *Widakuswara*, No. 25-cv-01015 (D.D.C., Apr. 14, 2025), Dkt. No. 88-4.

On June 20, 2025, when USAGM sought to restart the RIF process by sending specific notices to bargaining unit employees that would be separated from the agency, AFGE Local 1812 immediately requested a meeting with the agency pursuant to Article 21 of its collective bargaining agreement. Hickey Dec. ¶¶ 23–24 & Ex. 5. The purpose of that meeting was to inform the agency that the RIF violated the collective bargaining agreement and applicable law. *Id*. Pursuant to the procedures set forth in the collective bargaining agreement, representatives from the union and USAGM met on June 23 to attempt to resolve disagreements before the union filed a formal written grievance. *Id*. ¶ 25 & Ex. 6. On June 24 and June 25, AFSCME Local 1418 similarly raised concerns to the agency about inaccuracies in the retention registers the agency had provided for the RIF. Dryden Decl. ¶ 32.

Soon thereafter, on June 27, the agency rescinded its legally deficient RIF notices to employees in the D.C. area but declined to rescind noncompliant notices to employees in New York and Florida. Hickey Decl. ¶¶ 26–27 & Ex. 7. One month after that, AFGE Local 1812 filed a formal grievance challenging the agency's implementation of the RIF and associated refusal to offer buyouts to employees who had been sent noncompliant RIF notices. *Id*. ¶ 27 & Ex. 8. Just

days later, USAGM rescinded all outstanding RIF notices, completing the rescission of the individual notices sent to Plaintiffs' represented employees. *Id*. ¶¶ 28–29.

Following the rescission of the June notices, Plaintiffs continued to take all available action to enforce their own and their members' statutory and CBA rights, including through grievances. On August 19, AFSCME Local 1418 filed a grievance that the agency was not abiding by provisions in its CBA that required the agency to assign bargaining unit members to work in Radio Master Control, at least absent an emergency. Dryden Decl. ¶ 38 & Ex. 8. That grievance was relevant to the RIF because the June retention registers indicated that all Master Control members of the bargaining unit would be separated from the agency, leaving only a supervisor to be assigned in Master Control—a violation of the CBA. *Id*. ¶ 35. As for AFGE Local 1812, its July 29 Grievance sought assurances that any future implementation of the RIF would be conducted in compliance with the provision of its CBA requiring at least 60 days' notice for affected employees. Hickey Decl. Ex. 8 at 4. The union raised the issue again in August, submitting an information request for documentation and informing the agency that the union would act if the agency attempted to implement a RIF with less than 60 days' notice. *Id*. ¶¶ 32–33 & Ex. 9.

### C. Days After Significant Litigation Wins by Plaintiffs, Defendants Eliminate Labor Rights at USAGM

As described above, AFSCME and AFGE pressed vigorously in court to ensure that USAGM and Defendant Lake complied with the preliminary injunction in the *Widakuswara* case, and on August 25, the district court ordered Defendant Lake and others to sit for depositions to explain their lack of compliance with court orders. The next day, USAGM again restarted its stalled RIF, notifying the court—mere hours after the court ruled, in open court, that plaintiffs' request to depose Defendant Lake was granted—that "pursuant to negotiated labor-management agreements," USAGM had "provided relevant unions" with information to be used to "issue

specific [RIF] notices to affected bargaining unit employees." Notice at 1, *Widakuswara*, No. 25-cv-01015 (D.D.C. Aug. 26, 2025), Dkt. No. 139.

AFGE Local 1812 immediately sprang into action, meeting with the agency on August 27 as the first step before filing a new grievance challenging the RIF. Hickey Decl. ¶ 35. Among other things, the union informed the agency that the agency's plan to issue specific RIF notices to employees only 30 days before the RIF's effective date would violate the agency's collective bargaining agreement with AFGE, which required 60 days' notice. *Id.* ¶¶ 32, 35. AFGE Local 1812 also informed the agency that it had an obligation to complete bargaining before resuming implementation. *Id.* ¶ 35. Nevertheless, the day after that meeting, on August 28, the *Widakuswara* defendants notified the court that the RIF would proceed according to plan. Notice at 2, *Widakuswara*, No. 25-cv-01015 (D.D.C. Aug. 28, 2025), Dkt. No. 141 (informing the court that the agency "plan[ned] to issue reduction-in-force[] (RIF) notices shortly" to 46 USAGM employees and 486 VOA employees).

That same day, President Trump issued Executive Order 14343, *Further Exclusions from the Federal Labor-Management Relations Program*, 90 Fed. Reg. 42683 (Aug. 28, 2025) ("Further Exclusion Order"), which removed USAGM from coverage under Chapter 71, the statute that gives federal workers the right to join unions and engage in collective bargaining with federal employers. Sections 1 and 2 of the Further Exclusion Order purported to exclude USAGM from the coverage of Chapter 71 pursuant to 5 U.S.C. § 7103(b)(1), which grants the President limited authority to issue an order excluding an agency or one of its subdivisions from Chapter 71's coverage if and only if the President determines that (1) "the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" and (2) "the provisions of [Chapter 71] cannot be applied to that agency or subdivision in a manner consistent

11

with national security requirements and considerations." 5 U.S.C. § 7103(b)(1); *see* Dryden Decl. Ex. 9. The White House published a Fact Sheet the same day as the Further Exclusion Order claiming that "USAGM is an arm of U.S. public diplomacy" and that "supporting U.S. national security is one of its key functions." Dryden Decl. Ex. 10 at 2.

USAGM wasted no time in stripping its employees of their labor rights: the very next morning, the agency sent letters to AFGE Local 1812 and AFSCME Local 1418 informing them that "collective bargaining rights under Chapter 71 are no longer applicable to your bargaining unit" and that "[a]ll collective bargaining activities, including negotiations, grievance procedures, and all labor-management relations, are hereby discontinued." *Id.* Ex. 11; Hickey Decl. Ex. 10. These letters also informed Plaintiffs that their collective-bargaining agreements with USAGM were cancelled "effective immediately." *Id.* Thus, in a period of less than 24 hours, Plaintiffs were, without warning or explanation, stripped of the statutory and contractual rights they had used for decades to protect the rights of USAGM employees.

With these legal protections removed, USAGM formally recommenced its RIF. The same day the agency rescinded Plaintiffs' collective bargaining agreements, the agency sent individual RIF notices to more than 500 of its remaining employees. Dryden Decl. ¶ 46 & Ex. 13; Hickey Decl. ¶ 40 & Ex. 11. Those notices informed employees that the effective date for the RIF would be in 30 days, on September 30, in violation of the 60-day notice requirement contained in the rescinded collective bargaining agreements. *Id.*; *see* Dryden Decl. Ex. 1, Art. 15 § 5(d); Hickey Decl. Ex. 1, Art. 30 § 5(d). The retention registers also showed, once again, that all Master Control members of the AFSCME bargaining unit would be separated from the agency, in violation of the union's CBA with the agency. Dryden Decl. ¶ 35, 39. Leaving no doubt that the Further Exclusion Order and its implementation were part and parcel of the plan to dismantle USAGM by making it

easier to fire employees en masse, the digital copy of the agency's letter to AFSCME Local 1418 rescinding the union's collective bargaining agreements was titled "AFSCME_2025RIF_AgencyNotice_20250829_signed.pdf." *Id*. ¶ 45 & Ex. 12.

The Further Exclusion Order, as implemented by Defendants, forecloses Plaintiffs and their affiliates from providing important services to their members at USAGM, including pursuing grievances to enforce the terms of the collective bargaining agreements that governed implementation of the RIF, negotiating over changes to terms of employment, representing members during investigatory interviews, and receiving advance notice of changes affecting employee rights. Ricci Decl. ¶ 4; Dryden Decl. ¶¶ 8–9; Kelley Decl. ¶ 5; Hickey Decl. ¶ 5. As a result, Plaintiffs and their affiliates are now unable to represent their members during a time of great upheaval at USAGM, and their members now must face an impending RIF without their union as their recognized exclusive representative. Dryden Decl. ¶¶ 55–56; Hickey Decl. ¶¶ 45–46.

### D.  The Further Exclusion Order Continues a Pattern of Retaliation Against AFGE, AFSCME, and Others Who Oppose the Administration's Policies

As its name suggests, the Further Exclusion Order was not the first time that the Trump administration has sought to punish unions representing federal workers and bring them to heel by eliminating their rights. On March 27, 2025, President Trump issued Executive Order 14251, *Exclusions From Federal Labor-Management Relations Programs*, 90 Fed. Reg. 14553 (Apr. 4, 2025) ("First Exclusion Order"), Kelley Decl. Ex. 1. In that order, the President declared that pursuant to his 5 U.S.C. § 7103(b) authority, an astonishingly wide swath of agencies and their employees—including the entire Department of Veterans Affairs and the entire Environmental Protection Agency—were excluded from Chapter 71. The scope of the First Exclusion Order was unprecedented, removing labor rights from approximately two-thirds of federal workers. *NTEU v.*

13

*Trump*, 780 F. Supp. 3d 237, 247 (D.D.C. 2025), *stayed pending appeal*, 2025 WL 1441563 (D.C. Cir. May 16, 2025).

That First Exclusion Order was accompanied by a Fact Sheet issued by the White House that laid bare its motivations: retaliating against unions that exercised their rights to oppose "President Trump's agenda." The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), Kelley Decl. Ex. 2. That Fact Sheet called out "hostile Federal unions" for "declar[ing] war on President Trump's agenda." *Id.* at 2–3. It also complained that "[t]he largest Federal union"—Plaintiff AFGE—"describes itself as 'fighting back' against Trump" and "is widely filing grievances to block Trump policies." *Id.* at 3. Finally, in case federal-sector unions did not get the message about how they should conduct themselves going forward, the Fact Sheet concluded by stating that "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions." *Id.*

The Fact Sheet's admitted aims were confirmed by the First Exclusion Order's internal contradictions. While claiming to exclude agencies based on national-security motivations, it nevertheless exempted subdivisions of the U.S. Marshals Service and "any agency police officers, security guards, or firefighters" (therefore allowing those employees to retain their bargaining rights), *except* those working at the Bureau of Prisons, where AFGE represents all bargaining unit employees. Kelley Decl. Ex. 1, § 2 (1-499(a)). The First Exclusion Order also permitted the Departments of Defense and Veterans Affairs to reinstate bargaining rights for certain subdivisions. *Id.* § 4. The VA used this authority to restore rights on a union-by-union basis, Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12171, 90 Fed. Reg.

16427 (Apr. 17, 2025), explaining that unions who had their rights restored had filed "no or few grievances," unlike unions such as Plaintiff AFGE, which the VA claimed "by contrast are using their authority" under Chapter 71 "to broadly frustrate the administration's ability to manage the agency," Erich Wagner, *VA Is Selectively Enforcing Trump's Order Stripping Workers of Union Rights*, Gov't Exec. (Apr. 18, 2025), https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/.

The Further Exclusion Order and its predecessor were both issued in response to federal unions, including AFGE and AFSCME, exercising their First Amendment rights to challenge Trump administration policies through speech and petitioning, including lawsuits, public advocacy, and grievances. From the start of the second Trump administration, AFGE and AFSCME have filed multiple lawsuits to push back against executive misconduct affecting federal workers and Americans writ large—including many filed jointly by the two unions. For example, when the Trump administration sought to fire tens of thousands of federal probationary employees, AFGE and AFSCME, with other organizations, brought suit and on March 14 obtained a preliminary injunction reinstating thousands of fired probationary workers at the Departments of Veterans Affairs, Agriculture, Interior, Energy, Defense, and Treasury. *AFGE v. OPM*, 770 F. Supp. 3d 1215 (N.D. Cal. 2025), *stayed pending appeal*, 145 S. Ct. 1914 (Mem.) (Apr. 8, 2025).[2]

AFGE and AFSCME's litigation—and wins—continued after the First Exclusion Order was issued. For example, on June 2, AFGE obtained a preliminary injunction halting the retaliatory

---

[2] Other lawsuits filed against the administration by Plaintiffs AFSCME and AFGE or their affiliates prior to the First Exclusion Order include, *e.g.*, *AFGE v. Trump*, No. 25-cv-00264 (D.D.C.) (AFGE, AFSCME); *AFGE v. Ezell*, No. 25-cv-10276 (D. Mass.) (AFGE, AFSCME); *AFGE v. OPM*, No. 25-cv-01780 (N.D. Cal.) (AFGE, AFSCME); *AFSCME v. SSA*, No. 25-cv-00596 (D. Md.) (AFSCME); *AFL-CIO v. DOL*, No. 25-cv-00339 (D.D.C.) (AFGE, AFSCME); *All. for Retired Ams. v. Bessent*, No. 25-cv-00313 (D.D.C.) (AFGE); *Somerville Pub. Schs. v. Trump*, No. 25-cv-10677 (D. Mass.) (AFSCME).

and unlawful termination of its CBA covering 47,000 employees at the Transportation Security Administration. *AFGE v. Noem*, No. 25-cv-00451, 2025 WL 1557270 (W.D. Wash. June 2, 2025).[3] Likewise, AFSCME joined a coalition of litigants who obtained a preliminary injunction restoring public health grants to local governments, *Harris Cnty. v. Kennedy*, No. 25-cv-01275, 2025 WL 1707665 (D.D.C. June 17, 2025), and an AFSCME affiliate and co-plaintiffs obtained a preliminary injunction reinstating the union's members at the Corporation for National and Community Service (aka AmeriCorps) and restoring AmeriCorps grants and programs, *Elev8 Balt., Inc. v. Corp. for Nat'l & Cmty. Serv.*, No. 25-cv-01458, 2025 WL 1865971 (D. Md. July 7, 2025). And just last week, AFGE and AFSCME won summary judgment in their suit challenging the unlawful termination of thousands of probationary employees. *AFGE v. OPM*, No. 25-cv-01780, 2025 WL 2633791 (N.D. Cal. Sept. 12, 2025).

In addition to pursuing relief in court, Plaintiffs have been outspoken in their public criticism of administration policies. *See* Ricci Decl. ¶¶ 111–23; Huddleston Decl. ¶¶ 75–89. And they have also exercised their First Amendment rights by filing grievances against agencies when Trump administration policies violate the rights of covered employees. AFGE affiliates filed grievances on administration policies at the VA, for example, including grievances regarding the cancellation of alternative workplace arrangements. Kelley Decl. ¶ 24.

The administration's pattern of retaliating against disfavored speech extends beyond federal unions. After explicitly threatening law firms perceived as hostile,[4] President Trump

---

[3] In that case, AFGE and its co-plaintiffs filed suit on March 13, 2025, and moved for their preliminary injunction on April 4, 2025.

[4] *See* Joe DePaolo, *'We Have a Lot of Law Firms We're Going After': Trump Declares Plan to Target Law Firms He Considers 'Very, Very Dishonest'*, Mediaite, https://www.mediaite.com/news/we-have-a-lot-of-law-firms-were-going-after-trump-declares-plan-to-target-law-firms-he-considers-very-very-dishonest/ (Mar. 9, 2025, at 11:21 ET).

followed through with those threats and issued multiple executive orders seeking to punish law firms because they represented clients or causes that he dislikes or disagrees with.[5] President Trump revoked such punitive measures, however, when a firm agreed, in effect, to partner with his administration by making "policy changes" and dedicating tens of millions of dollars in "pro bono legal services" to support causes favored by the President. Executive Order 14244, *Addressing Remedial Action by Paul Weiss*, 90 Fed. Reg. 13685 (Mar. 21, 2025). The administration has similarly terminated and frozen millions of dollars of funds to Harvard University in retaliation for its protected activity, with the President forthrightly admitting that "every time [Harvard] fight[s], they lose another $250 million." *President & Fellows of Harvard Coll. v. HHS*, No. 25-cv-11048, 2025 WL 2528380, at *9, 22–26 (D. Mass. Sept. 3, 2025) (granting summary judgment for plaintiffs on First Amendment retaliation claims).

The elimination of bargaining rights at USAGM is a part of this same pattern: after threatening that federal unions should "work with him" and that he "will not tolerate mass obstruction," Kelley Decl. Ex. 2 at 3, President Trump struck back at AFGE and AFSCME in response to their persistence in engaging in protected activity to stand up for their members and the rule of law.

---

[5] *See, e.g.*, *Perkins Coie LLP v. DOJ*, 783 F. Supp. 3d 105, 120 (D.D.C. 2025) ("[T]his Order stigmatizes and penalizes a particular law firm and its employees . . . due to the Firm's representation . . . of clients pursuing claims and taking positions with which the current President disagrees."); *Jenner & Block LLP v. DOJ*, No. 25-cv-00916, 2025 WL 1482021, at *12 (D.D.C. May 23, 2025) (President Trump sought to "leverage the Executive's control over security clearances as a way to change speech"); *Wilmer Cutler Pickering Hale & Dorr v. EOP*, No. 25-cv-00917, 2025 WL 1502329, at *14 (D.D.C. May 27, 2025) ("The Order shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished!"); *Susman Godfrey LLP v. EOP*, No. 25-cv-01107, 2025 WL 1779830, at *17 (D.D.C. June 27, 2025) ("[T]he Order constitutes unlawful retaliation . . . for activities that are protected by the First Amendment, including its representation of certain clients [and] its donations to certain causes.").

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must show "[1] likely success on the merits, [2] likely irreparable harm in the absence of preliminary relief, [3] a balance of the equities in its favor, and [4] accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted). When the government is the party opposing injunctive relief, the third and fourth factors, "the balance of the equities and the public interest, merge and can be considered together." *Ramirez v. ICE*, 568 F. Supp. 3d 10, 34 (D.D.C. 2021).

## ARGUMENT

Plaintiffs are entitled to preliminary relief enjoining the implementation of Sections 1 and 2 of the Further Exclusion Order. As described below, Plaintiffs are likely to succeed on the merits of their claims that the order violates the First Amendment and is *ultra vires.* Plaintiffs are suffering and will continue to suffer irreparable harm absent injunctive relief as a result of ongoing constitutional injury and the significant injuries that flow from the elimination of Plaintiffs' and their members' statutory and contractual labor rights. Finally, the equities decidedly favor preserving the status quo while the parties litigate the constitutionality of the Further Exclusion Order to final judgment.

### I.    Plaintiffs are Likely to Succeed on the Merits

Plaintiffs' challenges to the Further Exclusion Order and the implementation of that order by Defendants are likely to succeed on the merits. First, by retaliating against Plaintiffs for their speech and petitioning and discriminating against them based on their viewpoints, the Further Exclusion Order violates the First Amendment. Second, the order is *ultra vires* because it exceeds the careful limitations that Congress placed on exclusions from Chapter 71 and instead eliminates labor rights without regard to the applicable statutory criteria in order to retaliate against political enemies and facilitate dismantlement of targeted federal agencies.

### A.  The Further Exclusion Order Violates the First Amendment

Defendants seek to clamp down on dissent and punish Plaintiffs for speaking out against administration policies that they oppose, in violation of bedrock constitutional rights. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). By eliminating statutory and contractual labor rights at USAGM to retaliate against Plaintiffs for their speech and petitioning activity, Defendants have engaged in conduct squarely prohibited by the First Amendment.

### 1.  The Exclusion Order Retaliates Against Plaintiffs for Constitutionally Protected Speech and Petitioning.

"[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018). To establish a claim of retaliation under the First Amendment, the plaintiff must show that "(1) he engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Plaintiffs are likely to succeed in establishing each of these elements.

a.     There can be no question that Plaintiffs have engaged in activity protected by the First Amendment. Plaintiffs AFSCME and AFGE have actively litigated against Defendants for their efforts to dismantle USAGM; their affiliates, Plaintiffs AFSCME Local 1418 and AFGE Local 1812, and members have raised concerns regarding the dismantlement directly to the agency

through grievances and other speech; and even before the dismantlement of USAGM, Plaintiffs repeatedly engaged in public speech and petitioning activity—including public advocacy, lawsuits, and grievances to enforce contractual agreements—that has been critical of many other aspects of President Trump's agenda. *See* Ricci Decl. ¶¶ 16–123, Huddleston Decl. ¶¶ 5–89; *see also supra* at p. 4–13.

These actions are indisputably protected by the First Amendment. Filing lawsuits against the government and "criticisms of public officials" are "high in the hierarchy of First Amendment values." *Lozman*, 585 U.S. at 101; *see also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 524 (2002) ("right to petition" is "one of 'the most precious of the liberties safeguarded by the Bill of Rights'" (citation omitted)); *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). The First Amendment equally protects the right to seek redress through administrative and other processes established by the government. *See*, *e.g.*, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) ("This Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."); *Janus v. AFSCME Council 31*, 585 U.S. 878, 914 (2018) (public sector union's "speech in the handling of grievances may be of substantial public importance and may be directed at the 'public square'"); *Garcia v. District of Columbia*, 56 F. Supp. 2d 1, 6 (D.D.C. 1998) (grievance filed by prison inmate "is clearly protected by the First Amendment").

b.    The Further Exclusion Order's exclusion of USAGM employees from Chapter 71 and the implementation of that exclusion is an adverse action that is "sufficient to deter a person of ordinary firmness" from exercising their rights. *Aref*, 833 F.3d at 258. The Further Exclusion Order eliminates statutory labor rights that Plaintiffs and their members have exercised for decades

and that provide important benefits and protections to Plaintiffs and their members. And the day after it was issued, Defendants informed Plaintiffs that they were "cancelling" their collective bargaining agreements with Plaintiffs "effective immediately" and discontinuing "all collective bargaining activities, including negotiations, grievance procedures, and all labor-management relations." Dryden Decl. Ex. 11; Hickey Decl. Ex. 10. The Further Exclusion Order has therefore inflicted serious harm on Plaintiffs and their members, who have been left without their longstanding union representation and protections under collective bargaining agreements, including a mandatory 60-day notice period for RIFs, at a time they need it most: when Defendants are seeking to institute mass RIFs and dismantle USAGM.

Retaliatory actions that inflict this level of irreparable harm, *see infra* Part III, would certainly "chill a person of ordinary firmness" from engaging in speech and petitioning activity that is critical of President Trump's agenda. *See, e.g.*, *AFGE v. Trump*, No. 25-cv-03070, 2025 WL 1755442, at *10 (N.D. Cal. June 24, 2025) (First Exclusion Order chills speech), *stayed pending appeal on other grounds*, 148 F.4th 648 (9th Cir. 2025); *Ariz. Students Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 868–70 (9th Cir. 2016) (eliminating fee collection and remittance in response to First Amendment activity chills speech). The "bar" for retaliatory conduct that would chill speech "is not a high one," *Jenner & Block*, 2025 WL 1482021, at *7 n.7, and the conduct here—the wholesale elimination of statutory and contractual labor rights for Plaintiffs and their members—readily clears that hurdle. Moreover, while the chilling standard is objective and does not require proof of actual chill, *see Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)), it is telling that Defendants' retaliatory acts have had their intended effect and have chilled the speech of Plaintiffs' members. Kelley Decl. ¶ 16; Ricci Decl. ¶¶ 12; Dryden Decl. ¶ 57; Hickey

Decl. ¶¶ 47–48. And the chilling effect is all the more pronounced given that the retaliatory conduct has come straight from the President. As the Supreme Court has explained, "the greater and more direct the government official's authority, the less likely a person will feel free to disregard a directive from the official." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 191–92 (2024).

The chilling effect of the Further Exclusion Order is further heightened because it marks a continuation of the Trump administration's ongoing efforts to punish unions who speak out against the President by eliminating their bargaining rights. When the First Exclusion Order eliminated bargaining rights for most federal employees, the White House explained in an accompanying Fact Sheet that "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions." Kelley Decl. Ex. 2 at 3. The elimination of bargaining rights at USAGM after AFGE and AFSCME refused to desist and continued to exercise their First Amendment rights against the administration's efforts to dismantle USAGM is a warning flag for other unions and their members, sending the message that even if a union retains its labor rights at present, those rights can be snatched away at any time if the union refuses to fall in line and instead continues to advocate against the administration's policies.

c.    Plaintiffs will be able to establish the required causal relationship between their First Amendment activity and the Further Exclusion Order. Among other things, a causal relationship can be proved with evidence of "[1] a proximity in time between the protected speech and the adverse action, [2] the defendant's expression of opposition to the protected speech, and [3] evidence that the defendant proffered false or pretextual explanations for the adverse action." *Media Matters for Am. v. Bailey*, No. 24-cv-00147, 2024 WL 3924573, at *15 (D.D.C. Aug. 23,

2024) (quoting *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022)), *appeal dismissed sub nom.*, *Media Matters for Am. v. Paxton*, No. 24-7141, 2025 WL 492257 (D.C. Cir. Feb. 13, 2025). Plaintiffs have produced an array of evidence that demonstrates the required causal link.

First, the Further Exclusion Order carries out a threat announced by President Trump when the First Exclusion Order was issued. The Fact Sheet accompanying the First Exclusion Order explained that determinations on future labor rights depended on whether unions fell in line, stating that "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction[.]" Kelley Decl. Ex. 2 at 3; *see AFGE*, 2025 WL 1755442, at *11 (Fact Sheet "expressed support only for unions who toed the line" and "mandated the dissolution of long-standing collective bargaining rights and other workplace protections for federal unions deemed oppositional to the President"); *NTEU*, 780 F. Supp. 3d at 256 (Fact Sheet "suggests a retaliatory motive to punish unions for the war they have declared on President Trump's agenda" (cleaned up)). When AFSCME and AFGE refused to fall in line and instead continued to advocate for their members at USAGM in court and elsewhere, the President followed through with his earlier threat and eliminated their labor rights at USAGM.

Second, Plaintiffs have shown that the Further Exclusion Order was issued in close temporal proximity to their protected First Amendment activity. The First Exclusion Order followed close on the heels of significant successes in forestalling Defendants' dismantlement of USAGM through protected speech and petitioning. AFSCME and AFGE had a string of litigation victories—they obtained a temporary restraining order halting the administration's efforts to shut down USAGM and terminate its staff, won a preliminary injunction, and continued litigation to enforce that injunction's un-stayed order to restore VOA programming—culminating in an August 25 order requiring Defendant Lake and two other USAGM officials sit for depositions related to

their compliance with the preliminary injunction, as a the "final opportunity, short of a contempt trial," to demonstrate compliance. Order at 2, *Widakuswara*, No. 25-cv-01015 (D.D.C., Aug. 25, 2025), Dkt. No. 137. In the meantime, AFSCME's and AFGE's affiliates forestalled a RIF in June 2025 by enforcing their rights under collective bargaining agreements with USAGM, including through the filing of grievances, and were headed toward additional grievances to vindicate those rights in August. In the face of that momentum, the President issued the Further Exclusion Order (on August 28) and USAGM quickly followed (on August 29) with a notification that it was terminating its collective bargaining agreements with AFSCME and AFGE. The "close temporal proximity" between the Further Exclusion Order and the successful First Amendment activity by Plaintiffs provides ample basis to establish a causal connection. *See BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22–23 (D.D.C. 2015).

The administration's pattern of punishing Plaintiffs and others for protected First Amendment activity confirms the causal connection. When considering retaliatory motive, the "sequence of events leading up to the challenged decision" can "shed some light on the decisionmaker's purposes." *Media Matters for Am.*, 2024 WL 3924573, at *17 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). Taking action to continue an ongoing "pressure campaign" against an organization shows a causal connection for a First Amendment retaliation claim. *Media Matters of Am. v. FTC*, No. 25-cv-01959, 2025 WL 2378009, at *20 (D.D.C. Aug. 15, 2025). The Further Exclusion Order is a continuation of the campaign commenced by the First Exclusion Order to punish and pressure Plaintiffs and other supposedly "hostile Federal unions" who have spoken out, litigated, and filed grievances against the administration. Kelley Decl. Ex. 2 at 2. The Further Exclusion Order is also of a piece with the administration's repeated retaliation against other individuals and organizations for their speech

and petitioning.[6] That larger context is not necessary to establish causation here, but that context also need not—and should not—be ignored.

Third, Defendants' statements criticizing and opposing Plaintiffs' protected speech provide additional evidence of retaliatory motivation. Defendant Lake publicly expressed her displeasure with Plaintiffs' lawsuit on numerous occasions. She complained in interviews that the agency had been "dragged into court" and that the *Widakuswara* plaintiffs were purportedly "trying to prevent us from listening to the president" and "trying to push contempt charges at me." Lake, *supra* p. 6. She attacked the "restraining order" that "made us stop doing what we're doing," complaining that the judge "is meddling in a place that he shouldn't." Newsmax, *supra* p. 6. In testimony before Congress, she called lawsuits against USAGM "malicious." *Spies, Lies, and Mismanagement: Examining the U.S. Agency for Global Media's Downfall, H. Comm. on Foreign Affs.*, 119th Cong. 16:48–16:54 (2025) (statement of Kari Lake), https://www.youtube.com /watch?v=Be_Ty1K5On8. Notably, in an August 12 interview after a show-cause order had been issued against USAGM following Plaintiffs' vigorous litigation efforts, Lake stated, "I've got a judge who wishes he were running the agency and literally threatening to put me in contempt of court if I don't produce more propaganda." Lewis, *supra* p. 7. Hinting that she believed an executive order could clear the obstacles Plaintiffs presented to dismantling USAGM, she went on

---

[6] *See Susman Godfrey*, 2025 WL 1779830, at *15; *President & Fellows of Harvard Coll. v. DHS.*, No. 25-cv-11472, 2025 WL 1737493, at *16–17 (D. Mass. June 23, 2025); *Mohammed H. v. Trump*, No. 25-cv-01576, 2025 WL 1692739, at *3–4 (D. Minn. June 17, 2025); *AFGE v. Noem*, 2025 WL 1557270, at *15 (W.D. Wash. June 2, 2025); *Wilmer Cutler Pickering Hale & Dor*, 2025 WL 1502329, at *14–15; *Jenner & Block*, 2025 WL 1482021, at *6–10; *Am. Bar Ass'n v. DOJ*, 783 F. Supp. 3d 236, 245–47 (D.D.C. 2025); *Aditya W.H. v. Trump*, 782 F. Supp. 3d 691, 706–12 (D. Minn. 2025); *Ercelik v. Hyde*, No. 25-cv-11007, 2025 WL 1361543, at *10–13 (D. Mass. May 8, 2025); *Perkins Coie LLP*, 783 F. Supp. 3d 105, 150–65 (D.D.C. May 2, 2025); *Mahdawi v. Trump*, 781 F. Supp. 3d 214, 228–31 (D. Vt. 2025); *Öztürk v. Trump*, 779 F. Supp. 3d 462, 489–92 (D. Vt. 2025).

to say in the same interview: "Every time I'm facing an issue with my agency where I'm like, okay, how do we kind of get through that? I'm telling you, it's almost like I start to think, how can we work through an issue of something that's difficult, and then, boom, within like, a week, an executive order comes out addressing that issue." Lewis, *supra* p. 7, at 1:13:05–1:13:19.

Defendant Lake's statements about the USAGM litigation align with the administration's previous statements attacking First Amendment activity by Plaintiffs and others. When eliminating bargaining rights for most federal employees in March, the White House pointed out in its Fact Sheet that Plaintiff AFGE was "'fighting back' against Trump," quoting an AFGE publication highlighting that the union was pushing back against administration policies through litigation and lobbying. Kelley Decl. Ex. 2 at 3. President Trump similarly threatened to escalate penalties against Harvard University if it challenged the administration's policies through litigation, candidly telling journalists that Harvard "wants to fight" and that "every time [Harvard] fight[s], they lose another $250 million." *President & Fellows of Harvard College*, 2025 WL 2528380, at *9 (alteration in original).

Finally, the evidence demonstrates that the scant rationales Defendants have provided for the Further Exclusion Order are pretextual. The Fact Sheet accompanying the Further Exclusion Order stated that "USAGM is an arm of U.S. public diplomacy; supporting U.S. national security is one of its key functions." Dryden Decl. Ex. 10 at 2. Yet at the same time, Defendants are working to dismantle USAGM. The idea that national security is a "key function" of USAGM, *id.*, is wholly inconsistent with the administration's efforts to "eliminate[] [USAGM] to the maximum extent consistent with applicable law" and the President's previous declaration that USAGM was an "unnecessary" "element[] of the Federal bureaucracy," *id.* Ex. 2 at 1. Moreover, the assertion that supporting national security is a key function of USAGM is also contradicted by the statutory

firewall that insulates VOA and other USAGM broadcasters from political influence and precludes USAGM from acting as a policy arm of the United States government. *See supra* p. 3. That firewall ensures that USAGM's broadcasters produce independent journalism and do not decide or carry out government policy, let alone policy in the national security arena.

The Fact Sheet's assertions about the need to avoid delays at USAGM also lack credibility. According to the Fact Sheet, "[c]ertain procedural requirements in Federal labor-management relations can create delays in agency operations," and those "delays can impact the ability of agencies with national security responsibilities to implement policies swiftly and fulfill their critical missions." *Id.* Ex. 10 at 2. The Fact Sheet specifically asserted that collective bargaining agreements "limit[] agencies' ability to modify policies promptly," and "[e]ven when changes are permissible under [collective bargaining agreements], agencies must complete 'midterm' union bargaining, which can delay the implementation of time-sensitive national security measures." *Id.* But employees at USAGM and VOA have engaged in collective bargaining with their agency employers for decades—even before the CSRA was enacted—without any suggestion that the application of the labor laws to the agency has resulted in delaying agency action at the expense of national security, and the Fact Sheet identifies no intervening changes that would support a different conclusion. Moreover, Chapter 71 expressly grants agencies the right "to take whatever actions may be necessary to carry out the agency mission during emergencies," 5 U.S.C. § 7106(a)(2)(D), and agencies may "unilaterally change working conditions" without bargaining "if the changes are necessary to the functioning of the agency . . . . such that a delay in implementation would have impeded the agency's ability to effectively and efficiently carry out its mission," *Sport Air Traffic Controllers Org. & U.S. Dep't of the Air Force*, 68 F.L.R.A. 9, 11

(2014). The implausibility of the Fact Sheet's rationales for excluding USAGM from federal labor laws confirms that those rationales are a pretext for First Amendment retaliation.

Nor does the Further Exclusion Order's mere invocation of national security exempt it from First Amendment scrutiny. The protections of the First Amendment do not dissolve simply because the government claims national security as a rationale for restricting speech. *See United States v. Robel*, 389 U.S. 258, 264 (1967) ("It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties . . . which makes the defense of the Nation worthwhile."); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (rejecting prior restraint on newspaper where government invoked national security); *see also Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 426 (1934) ("[E]ven the war power does not remove constitutional limitations safeguarding essential liberties.").

*     *     *

The First Amendment "prohibits government officials from relying on the threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech." *Vullo*, 602 U.S. at 189 (cleaned up). Eliminating labor rights for Plaintiffs and their members to suppress their ongoing First Amendment activity is antithetical to the First Amendment and should be enjoined.

### 2.  The Further Exclusion Order Is Impermissible Viewpoint Discrimination.

The Exclusion Order also violates the First Amendment by discriminating against Plaintiffs and their members due to their viewpoints. "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Vullo*, 602 U.S. at 187. The First Amendment's protections "reflect our profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Elrod v. Burns*, 427 U.S. 347, 357 (1976) (internal quotation omitted).

Viewpoint discrimination is "an egregious form of content discrimination," and thus the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

The Further Exclusion Order's elimination of bargaining rights is a continuation of the administration's efforts to target "hostile" federal unions who have "declared war on President Trump's agenda." Kelley Decl. Ex. 2 at 3. In March, the White House suggested to unions that they could avoid further harm if they choose to "work with" President Trump and not engage in "mass obstruction." *Id.* Thus, it is undeniable that the Further Exclusion Order targets unions, including Plaintiffs, who have been critical of President Trump's agenda and have publicly expressed those views through constitutionally protected speech and petitioning activity.

The Supreme Court has repeatedly held that the government "cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Vullo*, 602 U.S. at 180; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Such actions are even more problematic where, as here, the viewpoint discrimination is directed at those who have challenged the legality of the President's expansive assertions of executive authority through conventional, constitutionally protected channels. As the Supreme Court has cautioned, "[w]e must be vigilant" when the government takes coercive action to "in effect insulate its own laws from legitimate judicial challenge." *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001).

### B. Defendants' Elimination of Labor Rights for Plaintiffs and Represented Employees at USAGM is *Ultra Vires*

Plaintiffs are also likely to show that the Further Exclusion Order is *ultra vires* because it exceeds the limited authority Congress granted the President in 5 U.S.C. § 7103(b). The record establishes that the President did not exclude USAGM from Chapter 71 based on the national-

security determination required by 5 U.S.C. § 7103(b). Rather, USAGM's employees were stripped of their bargaining rights to punish Plaintiffs for opposing the administration's agenda and for stymying the administration's efforts to dismantle and ultimately silence USAGM and VOA. Allowing the President to invoke "national security" in this broad manner as pretext to strip bargaining rights from unions who oppose his agenda effectively permits the President to repeal Chapter 71 in contravention of Congress's determination that "the right of employees to organize [and] bargain collectively . . . safeguards the public interest." 5 U.S.C. § 7101(a).

Courts may conduct *ultra vires* review to ensure that executive actions, including executive orders, comply with statutory limits on executive authority. *See Glob. Health Council v. Trump*, No. 25-5097, 2025 WL 2480618, at *8 n.14 (D.C. Cir. Aug. 28, 2025) (confirming that "ultra vires review remains available to test presidential action alleged to violate any spending or other statute"); *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) ("Courts remain obligated to determine whether statutory restrictions have been violated [by executive actions].")); *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority."); *see also Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) ("When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority. Rarely, if ever, has Congress withdrawn courts' jurisdiction to correct such lawless behavior . . . .").

In 5 U.S.C. § 7103(b)(1), Congress placed "two fairly exacting limitations on the President's authority to invoke the statutory provision" to exclude an agency from coverage under Chapter 71. *FEA v. Trump*, No. 25-cv-01362, 2025 WL 2355747, at *9 (D.D.C. Aug. 14, 2025).[7]

---

[7] These limitations distinguish § 7103(b) from statutes that delegate broad discretion to the President, such as the provision at issue in *Dalton v. Specter*, 511 U.S. 462, 474–76 (1994), which did "not at all limit the President's discretion." *FEA*, 2025 WL 2355747, at *8 (quoting *Dalton*,

The President must first determine that the agency "has as a primary function intelligence, counterintelligence, investigative, or national security work," and he must then also determine that Chapter 71 "cannot be applied to [the] agency . . . in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7103(b). The use of the legally discernible terms "national security" and "primary function," together with the larger statutory context, establish that the authority given to the President by Congress to exclude agencies from Chapter 71 is narrow, circumscribed, and subject to clear limitations.[8]

The term "national security" in 5 U.S.C. § 7103(b) has a limited meaning and does not extend to anything that strengthens the nation or contributes to foreign affairs. In *Cole v. Young*, 351 U.S. 536 (1956), the Supreme Court construed the term "national security" in a labor statute that gave certain federal officials the power to summarily suspend and dismiss civilian employees. The Court explained that "national security" must not be given an "indefinite and virtually unlimited meaning" that would allow an "exception to the general personnel laws" to be "utilized effectively to supersede those laws." *Id.* at 547. The Court therefore concluded that the term "national security" as used in the statute had a "narrow meaning" that "comprehend[ed] only those activities of the Government that are directly concerned with the protection of the Nation from internal subversion or foreign aggression, and not those which contribute to the strength of the Nation only through their impact on the general welfare." *Id.* at 544; *see Dep't of Energy, Oak*

---

511 U.S. at 476). The unpublished order by the special panel in *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) ("AFSA II")—which does not constitute "the law of the case for the purposes of further proceedings," *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974), let alone binding authority in a separate case such as this one— failed to grapple with these significant statutory limitations, or the Supreme Court's limiting construction of the term "national security" in another labor statute in *Cole v. Young*, 351 U.S. 536 (1956).

[8] The Fact Sheet accompanying the Further Exclusion Order did not suggest that USAGM has an intelligence, counterintelligence, or investigative function.

*Ridge Operations & NAGE, Loc. R5-181*, 4 F.L.R.A. 644, 655–56 (1980) (citing *Cole* and adopting a narrow definition of "national security" that extends only to "sensitive activities of the government that are directly related to the protection and preservation of the military, economic, and productive strength of the United States, including the security of the Government in domestic and foreign affairs, against or from espionage, sabotage, subversion, foreign aggression, and any other illegal acts which adversely affect the national defense").

There is no basis to conclude that the term "national security" as used in 5 U.S.C. § 7103(b) has a broader or different meaning than the term as used in the statute at issue in *Cole*. Rather, the larger statutory context confirms the limited scope of the President's exclusion authority in 5 U.S.C. § 7103(b). Congress enacted Chapter 71 because it concluded that collective bargaining "safeguards the public interest" and that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a). Congress intended to create a "statutory Federal labor-management program which cannot be universally altered by any President." 124 Cong. Rec. 29186 (Sept. 13, 1978) (statement of Rep. Clay). Congress contemplated that Chapter 71 would cover agencies with some involvement in national security efforts, providing that bargaining units may not include "any employee engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security," 5 U.S.C. § 7112(b)(6), and ensuring that a covered agency's ability to "take whatever actions may be necessary to carry out the agency mission during emergencies," *id.* § 7106(a)(2)(D). Thus, as in *Cole*, the term "national security" in 5 U.S.C. § 7103(b) cannot have a vague, broad meaning that would allow an "exception" to the general applicability of Chapter 71 to be "utilized effectively to supersede" Chapter 71. *Cole*, 351 U.S. at 547.

The President must also determine that an agency has national security work as a "primary function," 5 U.S.C. § 7103(b), which means that the agency must do more than just perform "*some work* that implicates national security." *NTEU*, 780 F. Supp. 3d at 260. Ignoring that requirement— particularly in combination with a capacious interpretation of the term "national security"— would allow the executive branch to unilaterally circumvent the labor protections that Congress determined were in the public interest and would undermine the calibrated statutory scheme that Congress created. *Cf. OPM v. FLRA*, 864 F.2d 165, 168 (D.C. Cir. 1988) (cautioning against reading Chapter 71 "to grant to management the protection that it was unable to secure from Congress," and explaining that courts should not "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other").

The Further Exclusion Order exceeds the limits on executive authority in 5 U.S.C. § 7103(b). First and foremost, the record establishes that the Further Exclusion Order was issued to retaliate against unions that are perceived as hostile and to eliminate obstacles to the dismantlement of USAGM, *see supra* Part I.A, not based on a determination that USAGM had as a primary function national security work and that collective bargaining was incompatible with any national security functions performed by the agency. The issuance of an order excluding an agency from Chapter 71 based on a determination to retaliate and facilitate agency closure—and not the national-security determination required by 5 U.S.C. § 7103(b)—is *ultra vires* and unlawful.

The White House's contemporaneous explanation for the exclusion of USAGM confirms that the President did not determine that USAGM has a primary function of national security work. The Fact Sheet accompanying the Further Exclusion Order states that "USAGM is an arm of U.S. public diplomacy" and that "supporting U.S. national security is one of its key functions." Dryden

Dec. Ex. 10 at 2. But "public diplomacy" is very different than "the protection of the Nation from internal subversion or foreign aggression," *Cole*, 351 U.S. at 544, or protecting the government "against or from espionage, sabotage, subversion, foreign aggression," *Oak Ridge*, 4 F.L.R.A. at 655–56, as required by 5 U.S.C. § 7103(b). The disconnect between the Fact Sheet and the limited definition of "national security" in 5 U.S.C. § 7103(b) is made clear from USAGM's own description of its mission: "to inform, engage, and connect people around the world in support of freedom and democracy," U.S. Agency for Glob. Media, *Mission*, https://www.usagm.gov/who-we-are/mission/ (last visited Sept. 17, 2025).[9] Similarly, USAGM's statutory structure—which includes a firewall requiring USAGM leadership to "respect the professional independence and integrity" of its networks and journalists, 22 U.S.C. § 6204(b)—also belies a claim that USAGM has a primary function of national security work. That firewall insulates USAGM broadcasters from political influence and ensures that they operate with independence and integrity. USAGM is not a "state-sponsored propaganda operation[]" but rather operates with "editorial independence" and produces objective journalism. U.S. Agency for Global Media, *Firewall*, https://www.usagm.gov/who-we-are/firewall/ (last visited Sept. 17, 2025). USAGM does not determine or carry out government policies, let alone policies in the national security area. It therefore defies credulity to contend that USAGM has national security work as a primary function.[10]

---

[9] The proposition that the Further Exclusion Order's exclusion of USAGM from Chapter 71 was *not* based on a national-security determination is further bolstered by the fact that employees at USAGM (and its predecessor agencies) have enjoyed labor rights and collectively bargained for decades. Dryden Decl. ¶ 6; Hickey Decl. ¶ 4.

[10] The proposition that the Further Exclusion Order's exclusion of USAGM from Chapter 71 was *not* based on a national-security determination is further bolstered by the fact that employees at USAGM (and its predecessor agencies) have enjoyed labor rights and collectively bargained for decades. Dryden Decl. ¶ 6; Hickey Decl. ¶ 4.

The Court should also consider the Further Exclusion Order in light of the First Exclusion Order it purports to augment. The expansive scope of the agencies the orders collectively exclude from Chapter 71 establishes that those agencies, including USAGM, were not excluded based on a determination that they have a primary function of performing national security. To the contrary, the broad swath of excluded agencies demonstrates that the President has "patently disregard[ed] the specific and unambiguous statutory directives in [Chapter 71]." *FEA v. Trump*, No. 25-cv-01362, 2025 WL 2355747, at \*15 (D.D.C. Aug. 14, 2025) (cleaned up). It is facially implausible to claim that a collection of agencies that includes the Treasury Department, Veterans Affairs Department, and the Environmental Protection Agency have a "primary function" of national security-work and therefore that any such determination undergirds their exclusion from Chapter 71. *See NTEU*, 780 F. Supp. 3d at 259–60 (same for agencies including Treasury and Bureau of Land Management). Likewise, the jagged line-drawing found in the President's exclusion decisions—which, for example, carves out police, firefighters, and security guards, except for those working at the Bureau of Prisons, where workers are represented exclusively represented by Plaintiff AFGE, *see* Kelley Decl. Ex. 1 at 2; Kelley Decl. ¶ 10—shows that animus drove the decision-making process, not any national-security determination.

The First Exclusion Order foreshadowed the exclusion of USAGM and other agencies where workers were represented by unions that continued to voice their opposition to administration policies. The Fact Sheet that accompanied the First Exclusion Order concluded with an implicit threat of additional retaliation if unions did not "work with" the administration. Kelley Decl. Ex. 2 at 3. After Plaintiffs nonetheless persisted in their opposition despite that threat, including by litigating against the dismantlement of USAGM and VOA and by asserting their contractual rights and filing grievances regarding the RIF at USAGM, the President responded by

35

making good on his threat. Needless to say, disciplining unions that exercise their First Amendment rights to oppose the President's policy agenda is not encompassed in the authority granted to the President in 5 U.S.C. § 7103(b) and is therefore *ultra vires*.

On this record, any presumption of regularity, which presumes that public officers have properly discharged their official duties unless there is clear evidence to the contrary, is either inapplicable or rebutted. *See FEA*, 2025 WL 2355747, at *9–11 (presumption rebutted when evidence shows statements at odds with congressional findings in Chapter 71, evidence shows retaliatory motive, and evidence suggests 7103(b) was invoked "in furtherance of unrelated policy goals"). Among other things, the Fact Sheets accompanying the Exclusion Orders demonstrate "actual irregularity in the President's factfinding process or activity." *AFGE v. Reagan*, 870 F.2d 723, 728 (D.C. Cir. 1989); *see supra* Part I.A. By claiming that Chapter 71 "enables hostile Federal unions to obstruct agency management," Kelley Decl. Ex. 2 at 2, the Fact Sheet accompanying the First Exclusion Order contradicts Congress's express findings that collective bargaining "safeguards the public interest" and that "labor organizations and collective bargaining in the civil service are in the public interest," 5 U.S.C. § 7101(a), Similarly, while the Fact Sheet accompanying the Further Exclusion Order suggested that the President excluded USAGM from Chapter 71 "to ensure that agencies vital to national security can execute their missions without delay," Dryden Decl. Ex. 10 at 2, that rationale is in considerable tension with the President's stated goal of dismantling USAGM and VOA and terminating their missions. *Id*. Exs. 2 & 3. It is also in considerable tension with USAGM's guarantee of journalistic independence to its employees. 22 U.S.C. § 6204(b); *see also Firewall*, supra at 3 (noting firewall's protection "from political and other such influence").

In short, the evidence indicates that Defendants determined that USAGM and VOA should be dismantled and that Plaintiffs' First Amendment activity was a hindrance to that policy goal, not that USAGM has national security work as a primary function, as required by 5 U.S.C. § 7103(b). The use of the exclusion authority in 5 U.S.C. § 7103(b) to advance policy goals that bear no relationship to national security—and which are themselves unlawful—is *ultra vires*.

### C.  Plaintiffs' Claims Are Not Channeled to the FLRA

The government has repeatedly argued that challenges to an order excluding an agency from the coverage of Chapter 71 must be "channeled" to the Federal Labor Relations Authority ("FLRA"), but courts have rejected that argument, and for good reason. *FEA*, 2025 WL 2355747, at *5–6; *AFGE*, 2025 WL 1755442, at *8–9; *NTEU*, 780 F. Supp. at 248–51.[11] USAGM has informed Plaintiffs that they no longer possess their status as exclusive representatives of employees at USAGM. Dryden Decl. Ex. 11; Hickey Decl. Ex. 10. USAGM has further informed Plaintiffs that "grievance procedures . . . are hereby discontinued." *Id.* And the government has instructed agencies that a union excluded from Chapter 71 by executive order "no longer has standing to file a[n unfair labor practice] charge or the FLRA to issue a complaint." Kelley Decl. Ex. 4, at A4. The FLRA itself holds that it lacks jurisdiction to hear cases when such an exclusion occurs. *U.S. Att'ys Off. S. Dist. of Tex. & AFGE Loc. 3966*, 57 F.L.R.A. 750 (2002). There is no

---

[11] Indeed, when the government sought declaratory relief blessing the validity of the First Exclusion Order, it went not to the FLRA but instead to federal district courts. *See, e.g.*, *U.S. Dep't of Defense v. AFGE*, No. 25-cv-00119, 2025 WL 2058374, at *1–2 (W.D. Tex. July 23, 2025) (dismissing case for lack of Article III standing). It has taken the incongruous position that the *government* is not channeled if it brings claims related to 7103(b) exclusions, but *unions* are. See *AFGE*, 2025 WL 1755442, at *9 & n.5 (noting government's "inconsistent position with respect to jurisdiction").

basis to conclude that in such circumstances Congress intended the FLRA to have jurisdiction over a challenge to an order excluding an agency from Chapter 71 pursuant to 5 U.S.C. § 7103(b).[12]

The government cannot purport to exclude Plaintiffs from an administrative scheme (Chapter 71) and then insist that it must raise a challenge to that exclusion within the very administrative scheme from which it is excluded. *See AFGE Loc. 446 v. Nicholson*, 475 F.3d 341, 347–48 (D.C. Cir. 2007) (district court had jurisdiction over dispute because the challenged action was "expressly outside the FLRA's purview" and the union is "presumptively entitled to judicial review of its claim"). Because the President's order excludes USAGM "from coverage under this chapter," 5 U.S.C. § 7103(b)(1), this Court is the proper forum to challenge the Further Exclusion Order. *FEA v. Trump*, No. 25-cv-01362, 2025 WL 2355747, at *6 (D.D.C. Aug. 14, 2025) (asserting jurisdiction over claims from unions excluded under the First Exclusion Order because "there is no 'special statutory review scheme' that is actually available to the Union Plaintiffs for reviewing their claims.").

## II. Plaintiff Unions and Their Members Are Suffering Irreparable Injury Due to the Exclusion Order and its Implementation

Plaintiffs and their members will be irreparably harmed by the Further Exclusion Order absent a preliminary injunction. Those harms take several forms.

---

[12] And even if the FLRA had jurisdiction, the President's firing of an FLRA member without cause despite statutory for-cause protections, *see Grundmann v. Trump*, 770 F. Supp. 3d 166, 171–72 (D.D.C. 2025); 5 U.S.C. § 7104(b), has eliminated any implication that Congress would intend access to this no-longer-independent agency to strip jurisdiction from federal courts. *See Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 304–08 (4th Cir. 2025). The elimination of the "bedrock principle" of FLRA independence makes it even *more* implausible that Congress intended such an agency to review the President's § 7103(b) exclusions. *Cf. Owen*, 139 F.4th at 307 (discussing Merit Systems Protection Board and Special Counsel; *see* S. Rep. No. 95-969, at 24 (1978) (Congress created CSRA agencies to be wholly "independent of any control or direction by the President").

The Further Exclusion Order as implemented by Defendants has terminated Plaintiffs' collective bargaining agreements with USAGM and has stripped Plaintiffs and their members of their statutory labor rights. Those losses irreparably harm Plaintiffs. *See FEA*, 2025 WL 2355747, at *16 (recognizing that actions that "essentially terminate . . . collective bargaining agreements . . . cause irreparable harm"); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011); ("[T]he value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost."); *Cefalo v. Moffett*, No. 786-71, 1971 WL 797, at *3 (D.D.C. June 28, 1971) ("Ordinarily the loss of the rights, privileges and benefits of union membership constitutes irreparable harm sufficient to warrant injunctive relief."). And that harm is particularly pronounced considering USAGM employees' immediate need for union representation while the government seeks to conduct a reduction in force and dismantle their agency.

The D.C. Circuit has recognized that federal labor relations is "an area where relief, if it is to be effective, must come quickly." *In re AFGE*, 790 F.2d 116, 117–18 (D.C. Cir. 1986) (internal quotations omitted). This is all the more true for Plaintiffs and their members considering the dire circumstances currently facing employees at USAGM. The government issued specific notices of an impending RIF to the vast majority of USAGM employees immediately after depriving those employees of their labor rights. Because USAGM no longer recognizes Plaintiffs as the representative of employees at the agency and has rescinded the collective bargaining agreements between Plaintiffs and USAGM, those employees face the prospect of a sweeping reduction-in-force—and the dissolution of the agency itself—without union representation and the protections of the agreements their unions previously bargained for on their behalf. Among other things, USAGM has no statutory obligation to bargain or even meet with its unions, such that the unions

can no longer raise issues with proposed RIFs, USAGM employees lack the 60-day notice required by the collective bargaining agreements, and Plaintiffs cannot file a grievance based on the agency's failure to complete bargaining before implementing the RIF or failure to honor those notice requirements. Individual employees, if separated via RIF on September 30, will face great uncertainty as they grapple with an impending October 30 deadline to appeal their terminations to the Merit Systems Protection Board, a pathway that would ordinarily be displaced by the grievance procedures in their collective bargaining agreements. *See* 5 C.F.R. §§ 1201.3(c)(1); 351.802(a)(6). Absent a preliminary injunction, USAGM employees will be without important protections when they need them the most, and uncertain whether they should appeal their RIF notices to the MSPB.

Plaintiffs and their members also face immediate irreparable harm due to the denial of their constitutional rights. Losing "First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotations omitted). The Further Exclusion Order's ongoing chilling effects on speech cannot be remedied at the end of this litigation.

Plaintiffs' loss of rights from the Further Exclusion Order will also cause irreparable harm to the unions themselves. Without their status as exclusive bargaining representatives of employees at USAGM, Plaintiffs are unable to perform their fundamental functions as labor organizations. Dryden Decl. ¶¶ 50–56; Hickey Decl. ¶¶ 42–46; Ricci Decl. ¶ 11; Kelley Decl. ¶¶ 18–19. The harm the unions face during the period they are unable to perform those functions cannot be remedied at the conclusion of this litigation. The ability of unions to negotiate and enforce collective bargaining agreements on behalf of federal workers provides the primary impetus for workers to join the unions and pay dues. *See Small*, 661 F.3d at 1193 ("Whether or not the employer bargains with a union chosen by his employees is normally decisive of its ability to

secure and retain its members." (internal quotation omitted).[13] And for Plaintiffs AFSCME Local 1418 and AFGE Local 1812, the elimination of bargaining rights, combined with mass RIFs decimating their bargaining units, will "threaten[] the very existence" of their organizations. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Even if Plaintiffs regain their status as exclusive bargaining representative, the membership and support they lose in the interim will decrease their bargaining power. *See FEA*, 2025 WL 2355747, at *18 (D.D.C. Aug. 14, 2025) (quoting *Small*, 661 F.3d at 1192); *Hoffman v. Parksite Grp.*, 596 F. Supp. 2d 416, 423 (D. Conn. 2009) ("[O]ngoing failure to recognize the union . . . could significantly damage employee confidence in the union and chill any effort to exercise their collective bargaining rights in the future."). Because these "new obstacles unquestionably make it more difficult for [Plaintiffs] to accomplish their primary mission" of improving workers' employment conditions, the Further Exclusion Order "provide[s] injury for purposes both of standing and irreparable harm." *League of Women Voters*, 838 F.3d at 9.

### III. The Balance of the Equities and Public Interest Favors Preliminary Injunctive Relief

When the government opposes injunctive relief, "the balance of the equities and the public interest, merge and can be considered together." *Ramirez*, 568 F. Supp. 3d at 34. Congress has recognized that "labor organizations and collective bargaining in the civil service are in the public interest." 5 U.S.C. § 7101(a)(2). Union representation in the civil service is of particular importance to the public in the midst of attempts to close a longstanding agency with a storied

---

[13] Plaintiffs' activities are funded by their members through voluntary dues, often deducted from members' pay pursuant to 5 U.S.C. § 7115. Ricci Decl. ¶ 7; Dryden Decl. ¶ 10; Kelley Decl. ¶ 6–7; Hickey Decl. ¶ 7. However, agencies have been instructed to halt payroll deductions for union dues after terminating Plaintiffs' collective bargaining agreements, Kelley Decl. Ex. 3 at 6, Ex. 4 at 6, and USAGM has already stopped deducting dues on behalf of Plaintiffs, Dryden Decl. ¶ 53; Hickey Decl. ¶ 44.

history of providing objective journalism and projecting the values of our nation throughout the world. In contrast, it is little burden on the government to require it to function as it had for the decades that unions represented employees at USAGM before the Further Exclusion Order. And the public also has a strong interest in ensuring freedom of speech and petition and avoiding any chill on First Amendment activity. To the extent there is any question, the paramount value of those bedrock constitutional protections decidedly tips the balance of the equities in favor of preliminary relief.

## CONCLUSION

For the reasons stated above, the Court should grant a preliminary injunction and enter an order as proposed by Plaintiffs.

Respectfully submitted,

Date: September 19, 2025

/s/ *Abigail V. Carter*
Abigail V. Carter (DC Bar ID: 474454)
John M. Pellettieri*
Lane Shadgett (DC Bar ID: 90009847)
J. Alexander Rowell (DC Bar ID: 1780007)
Bredhoff & Kaiser, P.L.L.C.
805 Fifteenth Street, N.W. Suite 1000
Washington, D.C. 20005
Tel: (202) 842-2600
Fax: (202) 842-1888
acarter@bredhoff.com
jpellettieri@bredhoff.com
lshadgett@bredhoff.com
arowell@bredhoff.com

*Counsel for Plaintiffs*
*\*pro hac vice* application pending

Teague P. Paterson (DC Bar ID: 144528)
Matthew S. Blumin (DC Bar ID: 1007008)
Georgina Yeomans (DC Bar ID: 1510777)

American Federation of State, County, and
Municipal Employees, AFL-CIO
1625 L Street NW
Washington, DC 20036
Tel: (202) 775-5900
Fax: (202) 452-0556
tpaterson@afscme.org
mblumin@afscme.org
gyeomans@afscme.org

*Counsel for Plaintiffs American Federation of State,
County and Municipal Employees, AFL-CIO
(AFSCME) and AFSCME Local 1418*

Rushab B. Sanghvi (DC Bar ID: 1012814)
American Federation of Government Employees,
AFL-CIO
80 F Street NW
Washington, DC 20001
Tel: (202) 639-6426
SanghR@afge.org

*Counsel for Plaintiffs American Federation
of Government Employees (AFGE) and AFGE
Local 1812*